IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DISNEY ENTERPRISES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | C.A. No. _____ |
| INTERDIGITAL, INC., INTERDIGITAL VC | ) | |
| HOLDINGS, INC., INTERDIGITAL MADISON | ) | **DEMAND FOR JURY TRIAL** |
| PATENT HOLDINGS, SAS, INTERDIGITAL | ) | |
| CE PATENT HOLDINGS, SAS, VID SCALE, | ) | |
| INC., VID SCALE PATENTS, LLC, THOMSON | ) | |
| LICENSING SAS, AND TECHNICOLOR SA, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

1.      Plaintiff Disney Enterprises, Inc. ("Disney Enterprises" or "Plaintiff") brings this Complaint against InterDigital, Inc., InterDigital VC Holdings, Inc., InterDigital Madison Patent Holdings, SAS, InterDigital CE Patent Holdings, SAS, VID SCALE, Inc., VID SCALE Patents, LLC (collectively, "InterDigital"), Thomson Licensing SAS, and Technicolor SA (together, "Thomson," and collectively, "Defendants") under Sections 4 and 16 of the Clayton Act for violations and threatened violations of Sections 1 and 2 of the Sherman Act, and for a declaratory judgment that InterDigital's and its predecessors in interest's reasonable and non-discriminatory ("RAND") commitments apply with equal force to InterDigital's video encoding patents.

## NATURE OF THE ACTION

2.      Disney Enterprises brings this action to enjoin InterDigital's abusive patent-licensing practices and unlawful monopolization in relevant markets for video compression and streaming technology.  Disney Enterprises also seeks treble damages for InterDigital's violations

of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and a declaration that InterDigital's RAND commitments apply to its video-encoding technologies.

3.    InterDigital has, *inter alia*, engaged in an unlawful scheme to acquire, exploit, and maintain monopoly power over the technology to encode and decode content for video streaming.

4.    InterDigital owns certain patents that cover technologies for video encoding and decoding—functions that are critical to streaming video.  InterDigital insists that some of its patents cover technology mandated by industry standards, standards with which streaming services must comply to be compatible from end to end.  Upon information and belief, InterDigital licenses those patents on a portfolio basis with other patents that InterDigital contends are not mandated by industry standards.

5.    Members of a standard-setting organization ("SSO") draft and promulgate industry standards and collectively select the technologies that implementers of the standard must practice to comply with the standards.  Patents that cover an industry standard differ from other patents because they are infringed by implementing products and/or services that are compliant with the standard—these are "standard essential patents" or "SEPs."

6.    Before including patented or potentially patentable technology in an industry standard, SSOs require their participants to commit to license any putative SEPs on RAND terms to any willing licensee.  Among other purposes, this RAND requirement ensures that patent holders do not "hold up" implementers after standardization by refusing to license such patents at all, or by insisting on a non-RAND or supra-RAND royalty.

7.    "Hold up" strategies capitalize on the very nature of standardized industries: industry participants invest significant resources developing products and technologies that

conform to the standard and find it prohibitively expensive to abandon their investments and switch to another technology after standardization. Because industry participants become "locked in" to the standard, SEP holders may be able to renege on their RAND commitments, threaten the entirety of implementers' significant investments in standard-compliant products, and thereby extract supra-RAND royalties. In so doing, SEP holders risk running afoul of the competition laws.

8.      SSOs present a serious risk of anticompetitive harm when members withhold RAND commitments or make RAND commitments and refuse to honor them. These competition concerns are particularly acute where an SSO is dominated by those who control large patent pools and work together.

9.      That is what is happening here. InterDigital does not make or sell products that practice the H.264 or H.265 video standards (together, the "Compression Standards"). Its revenue stems from licensing its patents to those companies that make, sell, or offer for sale standard-compliant products and services.

10.     InterDigital falsely promised to license its video codec patents on RAND terms so that other members of the relevant SSO would include InterDigital's technologies in the Compression Standards and/or new releases of those standards.[1] InterDigital correspondingly manipulated the standard-setting process to exclude alternative technologies, and to ensure that the SSO moved forward with the Compression Standards and new releases instead of abandoning them.

---

[1]      "Codecs" are technologies "for encoding (also known as 'compressing') and decoding the rich data embedded in a digital 'packet' of audio and visual information so that it can be efficiently transmitted by the sender's device and then received and displayed by the recipient's device." Jonathan M. Barnett, *From Patent Thickets to Patent Networks: The Legal Infrastructure of the Digital Economy*, 55 JURIMETRICS 1, 11 (2014).

11.     After deceiving the SSO and its members and excluding rival technology from the Compression Standards and new releases, InterDigital exploited its unlawfully acquired power against Disney Enterprises and other implementers. InterDigital has:

- Refused to honor its obligation to license its video codec patents on RAND terms;

- Demanded excessive and discriminatory royalties from companies, including Disney Enterprises, that provide video-streaming services and implement the Compression Standards;

- Denied that it owes any obligation to license its video encoding patents on RAND terms;

- Licensed its declared video codec SEPs together with its undeclared video encoding patents ("Undeclared Patents") through portfolio licenses and other practices; and

- Pursued exclusionary remedies designed to increase Disney Enterprises' costs and thereby coerce Disney Enterprises to capitulate to InterDigital's unreasonable, non-RAND demands.

12.     By its acts, practices, and conduct, InterDigital has unlawfully monopolized each of the Relevant Technology Markets, as described in more detail below. InterDigital commands monopoly power in the Relevant Technology Markets. Working on its own and alongside its co-conspirator Thomson—InterDigital's predecessor in interest in some but not all of its SEPs—InterDigital systematically excluded competitors in the Relevant Technology Markets, acquired the power to demand supra-RAND licensing terms, and is in fact doing so. InterDigital's actions have injured competition by excluding alternative technologies; imposing unjustified costs and terms on Disney Enterprises and other companies that make, use, sell, or offer for sale goods or services practicing the Compression Standards; and hindering broader adoption of the Compression Standards. But for InterDigital's wrongful conduct, Disney Enterprises would have been able to obtain any necessary licenses to standard-essential technology on RAND terms, as well as InterDigital's encoding technology that InterDigital did not declare.

13.     Upon information and belief, InterDigital licenses its video encoding and decoding patents to others on only a portfolio-wide basis, *i.e.*, it licenses all of its video codec patents, whether declared SEPs or not, together.  As such, a RAND license to InterDigital's codec patents must include patents and patent applications that InterDigital or its predecessors-in-interest declared essential to the Compression Standards *and* its Undeclared Patents and patent applications—anything short of that would violate InterDigital's RAND commitments, as the terms would be discriminatory.

14.     Therefore, to remedy harms already inflicted and to prevent further harm to Disney Enterprises' business and property, including its streaming services Hulu, Disney+, and ESPN+, and to redress further harm to competition more generally in the Relevant Technology Markets, Disney Enterprises brings this action for treble damages, declaratory relief, and injunctive relief under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26.  Disney Enterprises also seeks a declaratory judgment under 28 U.S.C. §§ 2201 and 2202 that InterDigital's binding RAND promises to the relevant SSO encumber *all* its video codec patents, not just those that cover video-decoding technology.

## PARTIES

15.     Disney Enterprises is a Delaware corporation with its principal place of business at 500 South Buena Vista Street, Burbank, California 91521.

16.     On information and belief, InterDigital, Inc. is a Delaware corporation with its principal place of business at 200 Bellevue Parkway, Suite 300, Wilmington, Delaware 19809.

17.     On information and belief, InterDigital VC Holdings, Inc. is a Delaware corporation with its principal place of business at 200 Bellevue Parkway, Suite 300, Wilmington, Delaware 19809.  InterDigital VC Holdings, Inc. is a wholly owned subsidiary of InterDigital, Inc.

18.     On information and belief, InterDigital Madison Patent Holdings, SAS is a French société par actions simplifiée (simplified joint stock company) with its principal place of business at 3 Rue du Colonel Moll, Paris, France 75017.  InterDigital Madison Patent Holdings, SAS is a wholly owned subsidiary of InterDigital, Inc.

19.     On information and belief, InterDigital CE Patent Holdings, SAS is a French société par actions simplifiée (simplified joint stock company) with its principal place of business at 3 Rue du Colonel Moll, Paris, France 75017.  InterDigital CE Patent Holdings, SAS is a wholly owned subsidiary of InterDigital, Inc.

20.     On information and belief, VID SCALE Patents, LLC is a Delaware corporation with its principal place of business at 200 Bellevue Parkway, Suite 300, Wilmington, Delaware 19809.  VID SCALE Patents, LLC is a wholly owned subsidiary of InterDigital, Inc.

21.     On information and belief, VID SCALE, Inc. is a Delaware corporation with its principal place of business at 200 Bellevue Parkway, Suite 300, Wilmington, Delaware 19809.  VID SCALE, Inc. is a wholly owned subsidiary of InterDigital, Inc.

22.     On information and belief, Thomson Licensing SAS is a French société par actions simplifiée (simplified joint stock company) with its principal place of business at 975 Avenue des Champs Blancs CS 17616, 35510 Cesson-Sevigne, France.

23.     On information and belief, Technicolor SA is a French société anonyme (public limited company) with its principal place of business at 8-10 rue du Renard, 75004 Paris, France.

## JURISDICTION AND VENUE

24.     This Court has subject-matter jurisdiction over this action pursuant to 15 U.S.C. §§ 15 and 26 and 28 U.S.C. §§ 1331, 1337, and 2201-02.

25.    Defendants are subject to this Court's personal jurisdiction pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, Federal Rules of Civil Procedure 4(k)(1) and (2), and the Delaware Long Arm Statute, 10 Del. C. § 3104(c)(1). All Defendants have minimum contacts with this District or with the United States. Because of Defendants' contacts with this District and the United States, the exercise of personal jurisdiction over them would not offend traditional notions of fair play and substantial justice.

26.    Venue is proper under 15 U.S.C. § 22 because Defendants solicit and transact business in this District. InterDigital, Inc. and InterDigital VC Holdings, Inc. reside and maintain their principal places of business in this District. VID Scale Patents, LLC and VID SCALE, Inc. reside in this District. InterDigital Madison Patent Holdings, SAS, InterDigital CE Patent Holdings, SAS, Thomson Licensing SAS, and Technicolor SA transact business in this District, including with InterDigital, Inc. and InterDigital VC Holdings, Inc. Alternatively, venue is proper pursuant to 28 U.S.C. §§ 1391(b)(1), 28 U.S.C. §§ 1391(b)(2), or 28 U.S.C. §§ 1391(b)(3). InterDigital, Inc., InterDigital VC Holdings, Inc., VID Scale Patents, LLC, and VID SCALE, Inc. reside in this District, and a substantial part of the events or omissions giving rise to the claims occurred in this District. InterDigital Madison Patent Holdings, SAS, InterDigital CE Patent Holdings, SAS, Thomson Licensing SAS, and Technicolor SA are foreign entities and may be sued in any judicial district under 28 U.S.C. § 1391(c)(3).

## FACTUAL BACKGROUND

### A.    Standard-Setting Organizations

27.    Industry standards ensure the interoperability of products and facilitate the sharing of information among purchasers of products from competing suppliers, thereby enhancing the utility of all products and enlarging the overall consumer market. But in creating these

standards, SSOs and their members ultimately choose which technologies will be available to consumers and which technologies will not.

28.     Some of the technologies included in these standards are covered by patents. If the standard specifies the use of a particular technology that is covered by patents, devices that comply with the standard necessarily infringe those SEPs.

29.     Because a device or service that implements the standard has to practice integrated SEPs, the owners of SEPs—even the owner of just one SEP—can, unless restrained, demand and obtain exorbitant royalties, far in excess of the value (if any) of the related technology independent of its inclusion in the standard. Implementers that are unwilling to pay such excessive royalties face the risk of exclusion from all of the standard, including the unpatented and public-domain portions. This threat of foreclosure, left unchecked, puts an implementer's whole investment at risk. And SEP holders may attempt to make good on this threat by seeking exclusionary remedies that eliminate implementers' market access entirely.

30.     The term patent "hold up" refers to the exploitation of SEPs to extract unreasonable or discriminatory royalties or other terms. Patent hold-up harms competition, impedes the dissemination of standardized technology, and stymies consumer benefits that flow from widespread adoption of the standard. The RAND requirement serves to curb this potential for anticompetitive abuse and its effects. For example, if a patent holder refuses to commit to license on RAND terms, SSO rules typically require participants to select another technology for the standard or direct them not to standardize the related function at all.

31.     The anticompetitive effects of hold-up are magnified in the context of the Compression Standards, which incorporate many different SEPs held by many different patent owners. The cumulative royalty burden that an implementer must pay to satisfy all SEP holders

for a given standard is referred to as the "royalty stack." SEP holders are limited to the value of their SEPs as a portion of the royalty stack. And SEP holders cannot charge a premium based on the SSO writing their technology into the standard or from the value of the standard itself. Rather, the total royalty must be reasonable; the demands of any individual SEP owner must be assessed in light of the total number of SEPs included in the standard; and the royalty should reflect the "ex ante," pre-standardization value of the patent(s)—a point at which licensees could still turn to competing alternative technologies.

32. Principles of patent-exhaustion law also qualify SEP holders' rights. SEP holders may not "double dip" and extract multiple royalties for the use of the same patented invention from firms at different points of the same supply chain. Once the SEP holder licenses its technology to a firm, that firm's authorized use or sale of an item or service that embodies the SEP terminates all patent rights to that item.

**B. Standardization of Video-Compression Technology**

33. For over twenty years, a United Nations specialized agency for digital technologies—the International Telecommunication Union ("ITU")—has helped guide the development and commercial adoption of video-codec standards used in streaming.

34. Video coding or compression is the process of encoding a video file to reduce its size while maintaining an acceptable level of visual quality. An encoded video is represented as a bitstream—a sequence of bits—that can be transmitted to another device (e.g., a TV or smartphone) over the internet. The other device can then decode the encoded video bitstream to play the video. The compression process enables video streaming platforms to efficiently transmit high-quality videos over the internet.

35. The ITU and its associated SSOs—the ITU's Telecommunication Standardization Section ("ITU-T"), International Organization for Standardization ("ISO"), and

International Electrotechnical Commission ("IEC")—promulgated the two Compression Standards at issue here: the H.264 or Advanced Video Coding ("AVC") standard and the H.265 or High Efficiency Video Coding ("HEVC") standard.

36.     The ITU and its associated SSOs released the H.264 standard in 2003.[2] The H.264 video compression technology "was designed to enable the use of [a] coded video representation in a flexible manner for a wide variety of network environments."[3]   It is the predominant, and therefore the most compatible, video-coding standard in current use for streaming services.

37.     The ITU and its associated SSOs released the H.265 standard in 2013 as the successor to the H.264 standard.[4]  A variety of implementers use the H.265 standard to encode ultra-high-definition content.

38.     Video streaming services, including those that Disney Enterprises offers, must comply with the Compression Standards and associated releases to ensure compatibility between video viewing devices that are compliant with the Compression Standards and video content suppliers, e.g., streaming networks and services.  Companies supplying products that implement a standard facilitate interoperability among different products, and consumers of those products can be confident that products from multiple vendors will work together as intended under the standard.

---

[2]     *H.264: Advanced video coding for generic audiovisual services*, International Telecommunication Union, https://www.itu.int/rec/T-REC-H.264/ (last visited August 4, 2025).

[3]     *Recommendation ITU-T H.264 (V15) (08/2024)*, ITUPUBLICATIONS at i https://www.itu.int/rec/T-REC-H.264-202408-I/en (last visited August 4, 2025).

[4]     *H.265: High efficiency video coding*, International Telecommunication Union, https://www.itu.int/rec/T-REC-H.265 (last visited August 4, 2025).

39.     In contrast, video-streaming services that implement non-standardized coding techniques generally will not work, or will work on a commercially unpredictable and impractical manner, with the large majority of end-user devices.  Video-streaming platforms that do not comply with the standards therefore have little, if any, market appeal to potential subscribers.

40.     Once the ITU members selected the technologies for the Compression Standards and their associated releases, which now are widely employed by industry participants like Disney Enterprises, alternative technologies that could have performed the same or similar functions (or alternative functions) were effectively excluded.

41.     The Compression Standards are not stagnant.  Rather, they are subject to frequent technical updates and corrections as technology and the relevant industries evolve.  For example, there have been 15 official "versions" or "editions" (i.e. new releases) of the H.264 standard since its release in 2003 (though there have been closer to 28 total documents related to the standard).[5]  Similarly, there have been 10 total versions or editions of the H.265 standard since its release in 2013.[6]  Both were last updated in 2024.[7]

42.     Streaming platforms must continue to comply with the new "releases" or "versions" of the Compression Standards in order to maintain compatibility with end-user devices.

---

[5]     *H.264: Advanced video coding for generic audiovisual services*, International Telecommunication Union, https://www.itu.int/rec/T-REC-H.264/ (last visited August 4, 2025); *see also Advanced Video Coding*, Wikipedia, https://en.wikipedia.org/wiki/Advanced_Video_Coding#Versions (last visited August 4, 2025).

[6]     *H.265: High efficiency video coding*, International Telecommunication Union, https://www.itu.int/rec/T-REC-H.265 (last visited August 4, 2025).

[7]     *H.264: Advanced video coding for generic audiovisual services*, International Telecommunication Union, https://www.itu.int/rec/T-REC-H.264/ (last visited August 4, 2025); *H.265: High efficiency video coding*, International Telecommunication Union, https://www.itu.int/rec/T-REC-H.265 (last visited August 4, 2025).

### C.    The ITU Intellectual Property Rights Policy

43.    As a check on the anticompetitive risks of standard-setting, the ITU has implemented an Intellectual Property Rights ("IPR") Policy for the various standards it promulgates.  The ITU's IPR Policy seeks to protect against members' abuse of the market power that SEPs may confer on their owners.  In addition to other limitations imposed by law, the ITU's members must adhere to its IPR Policy.

44.    The IPR Policy's code of practice is set forth in three enumerated paragraphs.  Paragraph (1) provides that any party participating in the development of a standard should disclose "any known patent" or "any known pending patent application" to the ITU, ISO, and/or IEC.  Paragraph (2) envisions three different scenarios if the ITU considers adopting a patented technology into a standard:

> (2.1) The patent holder is willing to negotiate licences free of charge with other parties on a non-discriminatory basis on reasonable terms and conditions. . . .
>
> (2.2) The patent holder is willing to negotiate licences with other parties on a non-discriminatory basis on reasonable terms and conditions. . . .
>
> (2.3) The patent holder is not willing to comply with the provisions of either paragraph 2.1 or paragraph 2.2; in such case, the [standard] shall not include provisions depending on the patent.[8]

45.    Paragraph (3) demands that, regardless of whether case (2.1), (2.2), or (2.3) applies, the patent holder must provide a written statement to the ITU and/or ISO/IEC using a specific Patent Statement and Licensing Declaration form ("Declaration Form").  The Declaration

---

[8]    *See Guidelines for Implementation of the Common Patent Policy for ITU-T/ITU-R/ISO/IEC*, INTERNATIONAL ELECTROTECHNICAL COMMISSION, INTERNATIONAL ORGANIZATION FOR STANDARDIZATION & INTERNATIONAL TELECOMMUNICATION UNION, at Annex 1 (Apr. 23, 2012) ("2012 Guidelines"); *Guidelines for Implementation of the Common Patent Policy for ITU-T/ITU-R/ISO/IEC*, INTERNATIONAL ELECTROTECHNICAL COMMISSION, INTERNATIONAL ORGANIZATION FOR STANDARDIZATION & INTERNATIONAL TELECOMMUNICATION UNION, at Annex 1 (June 26, 2015) ("2015 Guidelines").

Form gives the patent holder three options—options 1, 2, and 3 that respectively correspond to cases (2.1), (2.2), and (2.3) of the IPR Policy.

46.    Parties that did not participate in the development of the standard may also submit Declaration Forms, and the Patent Policy and Guidelines apply to any patent or patent application disclosed after the approval of a standard.

47.    When a patent holder specifies a particular standard on a Declaration Form and submits it, the patent holder thereby commits to license any patents or patent applications that would be required to implement a specific ITU recommendation or deliverable, even if the Declaration Form does not specifically identify those patents or patent applications.  Specifically, the "Declaration Form gives patent holders the means of making a licensing declaration relative to rights in Patents required for implementation of a specific [standard]," and "by submitting th[e] Declaration Form the submitting party declares its willingness to license (by selecting option 1 or 2 on the Form) … Patents held by it and whose license would be required to practice or implement part(s) or all of a specific [standard]."[9]  The definition of "Patent" includes both patents and patent applications that would be essential to implement a specific standard.[10]

48.    According to the Guidelines, the "licensing declaration contained in the Declaration Form remains in force unless it is superseded by another Declaration Form containing more favourable licensing terms and conditions from a licensee's perspective[.]"[11]

49.    Regarding the assignment or transfer of patent rights, "if the Patent Holder specifically identified patents to ITU/ISO/IEC, then the Patent Holder shall have the assignee or

---

[9]    *See* 2012 Guidelines at 3; 2015 Guidelines at 3.

[10]    *See* 2012 Guidelines at 2; 2015 Guidelines at 2.

[11]    *See* 2012 Guidelines at 4; 2015 Guidelines at 4.

transferee agree to be bound by the same licensing commitment as the Patent Holder for the same patent."[12]

50.     Any participating patent holder that submits a Declaration Form thus is bound to the ITU, ISO, and/or IEC for the benefit of third-party implementers to offer to license on RAND terms both patents identified in the Declaration Form and any patents or patent applications that it owns that are required to implement the standard identified in the Declaration Form.

**D.      The Patent Privateering Agreement Between Technicolor, Thomson Licensing, and InterDigital**

51.     At one point, Thomson Licensing SAS ("Thomson"), a subsidiary of Technicolor SA, owned and licensed a substantial global portfolio of patents related to various video-streaming functionalities, some of which it declared essential to the Compression Standards.

52.     The Compression Standards effectively dictate which compression technology must be used and the competing technology that will be discarded. Consequently, Thomson had compelling incentives to ensure that the Compression Standards mandated the use of its patented technologies. Widespread adoption of the standard would translate into more licensing opportunities for Thomson, as well as first-mover advantages in commercializing the

---

[12]     2012 Guidelines at 5; *see also* 2015 Guidelines at 7 ("The rules governing the assignment or transfer of Patent rights are contained in the patent statement and licensing declaration forms (see Annexes 2 and 3)"); *id.* at Annex 2 ("Licensing declarations made pursuant to Clause 2.1 or 2.2 of the Common Patent Policy for ITU-T/ITU-R/ISO/IEC shall be interpreted as encumbrances that bind all successors-in-interest as to the transferred Patents. Recognizing that this interpretation may not apply in all jurisdictions, any Patent Holder who has submitted a licensing declaration according to the Common Patent Policy - be it selected as option 1 or 2 on the Patent Declaration form - who transfers ownership of a Patent that is subject to such licensing declaration shall include appropriate provisions in the relevant transfer documents to ensure that, as to such transferred Patent, the licensing declaration is binding on the transferee and that the transferee will similarly include appropriate provisions in the event of future transfers with the goal of binding all successors-in-interest.").

technology.  By contrast, if the ITU omitted Thomson's patents from the Compression Standards, there would likely be little market for licenses to those stranded technologies.

53.    In conjunction with the adoption of the Compression Standards, Thomson made submissions to the technical bodies within ITU declaring that certain of its patents or patent applications may be or become essential.

54.    Thomson positioned itself to claim that its patents covered technologies included in the Compression Standards by repeatedly assuring the ITU that it would license its patents on RAND terms.  Specifically, between 2003 and 2018, Thomson submitted numerous declarations to the ITU and its associated SSOs promising to license its SEPs to implementers of the Compression Standards on RAND terms.[13]  These declarations specifically reference and/or incorporate the ITU's IPR policy.  Accordingly, the ITU and its associated SSOs relied on these declarations when they decided to include (and continued to include in updated versions) any of Thomson's patents in the Compression Standards.

55.    As time passed, however, Thomson and its parent Technicolor began to encounter financial difficulties.  After posting a loss of 173 million euros for fiscal year 2017,[14] Technicolor announced losses of 152 million euros in the first half of 2018 alone.[15]  Needing free cash flow to stanch these losses, Technicolor and its subsidiary Thomson began to seek out a partner to commence a patent-transfer scheme, the object of which was to (i) circumvent the

---

[13]    *See, e.g.*, Ex. Nos. 1 – 4, Patent Statement and Licensing Declarations.

[14]    *See Technicolor 2017 Consolidated Financial Statements*, at 3 https://www.vantiva.com/app/uploads/2024/10/TCH-2017-12-FINANCIAL-REPORT-en-23-02-2018.pdf (reflecting a loss from continuing operations of 219 million euros and a net income loss of 173 million euros).

[15]    *See Technicolor: First Half 2018 Results*, GlobeNewswire (July 24, 2018) https://www.globenewswire.com/fr/news-release/2018/07/24/1541396/0/en/TECHNICOLOR-FIRST-HALF-2018-RESULTS.html.

RAND obligations that encumbered Thomson's SEPs, and (ii) embark on a "patent privateering" arrangement to hold up implementers of those SEPs. Technicolor and Thomson found a willing partner in InterDigital.

56.     In March 2018, InterDigital announced that it had made a binding offer to acquire Technicolor's patent licensing business (e.g. Thomson)—with its portfolio of more than 21,000 patents and applications, including over 2,500 worldwide video coding patents—for $150 million in cash plus a percentage of future licensing revenue.[16]  As part of this transaction, Technicolor/Thomson's "global team of licensing employees, patent managers and support staff w[ould] join InterDigital and work with its existing licensing team to license the expanded patent portfolio."[17]

57.     When the deal closed in July 2018, InterDigital announced that the final transaction ultimately included approximately 18,000 patents and applications, including approximately 3,000 worldwide video coding patents and applications.[18]  As part of the transaction, Technicolor received an entitlement to 42.5% of all future cash receipts from

---

[16]     *InterDigital Makes Binding Offer to Acquire Technicolor's Patent Licensing Business, Will Collaborate With Technicolor on Video Research*, interdigital (Mar. 1, 2018) https://ir.interdigital.com/news-events/press-releases/news-details/2018/InterDigital-Makes-Binding-Offer-to-Acquire-Technicolors-Patent-Licensing-Business-Will-Collaborate-With-Technicolor-on-Video-Research/default.aspx.

[17]     *See id.*

[18]     *InterDigital Completes Acquisition of Technicolor Patent Licensing Business*, interdigital (July 31, 2018) https://ir.interdigital.com/news-events/press-releases/news-details/2018/InterDigital-Completes-Acquisition-of-Technicolor-Patent-Licensing-Business/default.aspx.

InterDigital's patent-privateering campaign.[19]   Several employees that previously worked at Technicolor/Thomson left in July 2018 to join InterDigital.[20]

58.    In June 2019, InterDigital announced that it had completed an acquisition of the Research & Innovation (R&I) research and development organization of Technicolor, creating "one of the largest long-term R&D and licensing companies in the world."[21]   On information and belief, InterDigital assumed the rights and obligations of the R&I research and development organization and Technicolor's licensing business through these acquisitions.

### E.    InterDigital Makes Its Own (False) RAND Promises to the ITU

59.    InterDigital did not simply assume Technicolor's and Thomson's existing RAND obligations after hatching the patent-privateering conspiracy.  Rather, it affirmatively made a series of its own RAND declarations to the ITU and associated SSOs to ensure that the Compression Standards adopted and built upon its technologies. Starting in November 2011, InterDigital and its subsidiaries made numerous proposals to the ITU in connection with the formulation of the H.265 standard.  In those submissions, InterDigital acknowledged its potentially "current or pending patent rights relating to the technology described in th[ese] contribution[s]" and indicated its willingness to "grant licenses under reasonable and non-discriminatory terms as necessary for implementation of the resulting ITU-T Recommendation | ISO/IEC International Standard[.]"[22]  Before the ITU released the H.265 standard in 2013, InterDigital's wholly owned

---

[19]    *See id.*

[20]    *See, e.g.*, Ex. Nos. 5–8, LinkedIn Portfolios of Reitseng Lin, Rim Amor, Ron Kolczynski, and Alfred Chaouat.

[21]    *InterDigital Completes Acquisition of Technicolor R&I Unit*, interdigital (June 4, 2019) https://ir.interdigital.com/news-events/press-releases/news-details/2019/InterDigital-Completes-Acquisition-of-Technicolor-RI-Unit/default.aspx.

[22]    Ex. 9, Document JCTVC-G272-r1 (InterDigital proposal to ITU entitled "Non-CE10: Core Transform Design for HEVC" dated Nov. 22, 2011).

subsidiary VID SCALE, Inc. executed a Patent Statement and Licensing Declaration in which it promised to license its compression patents and patent applications to an unrestricted number of applicants on RAND terms.[23]  As with Thomson, the ITU and its associated SSOs relied on these promises when they decided to adopt InterDigital's and its subsidiaries' patents into the H.265 standard and subsequent editions of that standard.

60.    InterDigital's RAND declarations served at least two purposes. *First*, the declarations induced the ITU and its associated SSOs to continue to standardize technology potentially covered by InterDigital's patents and/or patent applications in the H.265 standard and new releases of both standards, as opposed to selecting a competing alternative technology or abandoning further standardization efforts altogether as to related functions.  InterDigital knew that if it did not promise to license its portfolio on RAND terms, Paragraph 2.3 of the ITU's IPR Policy would cause the ITU to (i) abandon any further standard or release based upon InterDigital's technology, and (ii) potentially turn to a competing technology for standardization instead. *Second*, InterDigital wanted to ensure that implementers of the Compression Standards continued to invest in developing standard-compliant devices or services, thereby making themselves more vulnerable to a hold-up campaign.

61.    InterDigital never intended to license its patents on RAND terms.  Instead, it used its RAND declarations as a vehicle to induce the ITU to standardize or continue standardizing technology related to its patents and/or patent applications; to steer the ITU away from selecting competing alternative technologies for adoption into the Compression Standards and later editions; and to lay the groundwork for a hold-up campaign, the ill-gotten gains from

---

[23]    *Patent Statement and Licensing Declaration for ITU-T or ITU-R Recommendation | ISO or IEC Deliverable*, at 2 (Apr. 2, 2013) https://www.itu.int/dms_pub/itu-t/oth/04/07/T04070005930001PDFE.pdf.

which InterDigital would partially share with Technicolor and Thomson. InterDigital concealed its true objectives from the ITU—to monopolize the markets for standardized technology, to engage in hold-up, to deny that it owed any obligation to license its encoding patents on RAND terms, and to insist on supra-RAND royalties and non-RAND terms in licensing negotiations.

        **F.**      **InterDigital Targets Disney Enterprises as Part of Its Hold-Up Campaign**

        62.     In July 2022, InterDigital initially contacted Disney Enterprises regarding the licensing of InterDigital's video codec patent portfolio. Since that time, InterDigital has steadfastly refused to make Disney Enterprises an offer to license on RAND terms any InterDigital encoding patents that Disney Enterprises may need to supply standard compliant video, despite Disney Enterprises' specific request for such a license. Indeed, InterDigital has taken the position that it is not obligated to offer or grant Disney Enterprises a license to any such patents on a worldwide, non-discriminatory basis and on reasonable terms and conditions to make, use, and supply implementations of the Compression Standards. Instead, InterDigital asserts that its encoding patents are not RAND-encumbered and that it can insist upon whatever royalty it wants for those patents.

        63.     Unsurprisingly given its position, InterDigital demanded license terms and conditions grossly exceed any possible RAND level. InterDigital cannot show that its license offers to Disney Enterprises are reasonable based on the ex ante value of its SEPs (and InterDigital rejects the proposition that it must offer a license based upon that ex ante value). In addition, hundreds of other entities own thousands of patents declared essential to the Compression Standards. No entity could realistically make, use, offer for sale, or sell products or services practicing the Compression Standards if subjected to licensing demands from all SEP holders on the scale of InterDigital's demands.

64.    InterDigital is aware that all of the video content that Disney Enterprises makes available on its streaming platform is compliant with one or both of the Compression Standards.   Because InterDigital knows Disney Enterprises is locked into the Compression Standards, InterDigital has abused its monopoly power by seeking to exclude Disney Enterprises' video streaming services from multiple markets around the world—without ever having made a licensing offer on RAND terms.   This is because InterDigital improperly seeks to abuse the leverage it stands to gain from a foreign injunction in some of Disney Enterprises' largest markets as a means of forcing Disney Enterprises to pay supra-RAND royalty rates.

65.    InterDigital's abuse of its monopoly and market power does not end with its insistence upon supra-RAND royalties.   InterDigital also refuses to grant Disney Enterprises a RAND license to supply video to already-licensed devices.   Instead, InterDigital seeks to double-dip on its Compression Standard SEPs by demanding that Disney Enterprises pay exorbitant royalties for a license to InterDigital's video codec portfolio, even when supplying video content compliant with the Compression Standards to device makers and end users who already have a license or benefit from patent exhaustion.   Through its monopoly and market power over technology essential to implementing the Compression Standards, InterDigital leverages the monopoly power associated with its declared SEPs to force a license for all its video codec patents and foist additional costs on device makers and end users.

### G.    InterDigital Required Secrecy To Hide Its Discriminatory Royalty Demands

66.    InterDigital shrouds its licensing negotiations and agreements under a veil of secrecy, refusing to discuss licensing terms for its SEP portfolio unless the standard-implementing, would-be licensee agrees to keep all related communications secret.  If the standard-implementing party will not agree to keep secret InterDigital's licensing proposals for its patents, InterDigital refuses to make licenses available.  InterDigital correspondingly refuses to disclose

the terms on which it has made its SEPs available to the competitors of would-be licensees, such as Disney Enterprises, and insists that its non-disclosure agreements prevent it from making that information available.

67.    InterDigital requires secrecy with the purpose and effect of furthering its patent hold-up.    Secrecy enables InterDigital to extract supra-RAND royalties, engage in discriminatory licensing, and to further abuse its monopoly power.    Transparency in licensing of SEPs would, in contrast, enable prospective licensees to assess more effectively InterDigital's non-compliance with its RAND commitments and expose its pattern and practice of violating its RAND obligations.

68.    On information and belief, InterDigital has discriminated against Disney Enterprises in its licensing demands.    InterDigital refused to provide Disney Enterprises with the pricing proposals it made to other standard-implementing companies so that Disney Enterprises could compare those proposals with InterDigital's demands to confirm non-discriminatory terms.

69.    On information and belief, InterDigital has required all other actual and would-be licensees to its video codec portfolio to agree to secrecy as a precondition for any licenses, licensing proposals, and related discussions.

70.    InterDigital uses the shroud of secrecy over its licensing proposals and discussions to extract monopoly rents.    InterDigital refuses to disclose relevant licensing information, including royalty amounts, offered to other putative licensees for the same patents.

## H.    InterDigital's Strategy to Enforce Its Abusive and Monopolistic Licensing Demands

71.    InterDigital supports its hold-up and discrimination against implementers of the Compression Standards, like Disney Enterprises, by threatening them with exclusion from major global markets.    InterDigital has so far filed several patent infringement cases in the Unified

Patent Court, Munich Regional Court, and Brazil—each asking for injunctive relief that would, in effect, completely exclude Disney Enterprises' streaming services from those markets.

72.    InterDigital's global litigation campaign against Disney Enterprises confirms its intent to circumvent its RAND commitments.  InterDigital surrendered the right to exclude standard implementers who are willing and able to license on RAND terms.  InterDigital's RAND obligations are intended to guarantee that InterDigital would not attempt to keep would-be implementers from using its patented material, such as by seeking an injunction, but would instead proffer licenses on RAND terms consistent with its commitment to the ITU.

73.    InterDigital intends the ongoing threats to Disney Enterprises' video-streaming business, as well as the cost associated with multi-front litigation, to force Disney Enterprises to capitulate to InterDigital's supra-RAND royalty demands and the other abusive and anticompetitive aspects of its licensing demands.  In addition, the threat of exclusion from major streaming markets puts at risk the revenue stream and investment for all of Disney Enterprises' streaming businesses, not just the portion attributable to the specific foreign jurisdictions—though those alone would be significant.

74.    The magnitude of the potential lost investment and revenue flowing from an exclusionary remedy is so extreme that Disney Enterprises and other would-be licensees in the same position can be strong-armed into submitting to InterDigital's excessive and discriminatory demands.  Any loss of goodwill and reputation would be irreparable.

**RELEVANT TECHNOLOGY MARKETS**

75.    For purposes of Disney Enterprises' antitrust claims, the relevant markets include the markets for technologies covered by the Thomson and/or InterDigital codec patents issued in the United States and elsewhere that are essential, or are alleged to be essential, to the "Compression Standards," together with all other alternative technologies to the Thomson and/or

InterDigital patents that could have been used in the Compression Standards and accompanying releases (the "Relevant Technology Markets"). InterDigital, its subsidiaries, and its predecessors in interest Thomson and Technicolor submitted declarations of essentiality to the ITU and committed to license their patents on RAND terms, and the markets for those technologies can be identified by those licensing declarations and proposals. The relevant geographic market for licenses in the Relevant Technology Markets is global in nature.

76.     Before the ITU adopted the Compression Standards and accompanying releases, competitors in the Relevant Technology Markets offered alternatives to InterDigital's essential technology that performed the same or equivalent functions and could have been adopted by the ITU and its members. When the ITU specified InterDigital's and its predecessors in interest's technologies in the Compression Standards and accompanying releases, however, the ITU eliminated competition to those technologies, thereby vesting InterDigital with monopoly power in the technology markets delimited by its SEPs. Through the standardization process and InterDigital's false RAND commitments, implementers became locked in, and there are now no reasonably interchangeable substitute technologies with InterDigital's SEPs for complying with these standards. Implementers must practice those patents to comply with the Compression Standards, and InterDigital and its predecessors in interest became the only commercially viable sellers in the Relevant Technology Markets.

## COUNT I: MONOPOLIZATION IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT, 15 U.S.C. § 2 (INTERDIGITAL)

77.     Disney Enterprises re-alleges and incorporates by reference the allegations set forth in paragraphs 1–76 above.

78.     By its acts, practices and conduct, InterDigital has unlawfully monopolized each of the Relevant Technology Markets.

79.     InterDigital commands monopoly power in the Relevant Technology Markets.  It is now the sole supplier in those markets with a dominant market share; has excluded alternative providers of competing technology through its false RAND promises; and thereby acquired the power to impose supra-RAND prices and other non-RAND terms and conditions on implementers, including Disney Enterprises.

80.     There are significant barriers to entry in the Relevant Technology Markets that insulate InterDigital's monopoly power.  Entry into those markets is difficult, costly, and time-consuming.  Barriers to entry include the need to make substantial, costly, and time-consuming investments in technology research and development.  And the standardization process itself interposes a barrier to entry—rivals in the Relevant Technology Markets would have to undo decades' worth of standardization and lock-in to persuade consumers to adopt an alternative to InterDigital's standardized technology.  InterDigital works to erect further barriers to entry: in reneging on its RAND commitments, InterDigital frustrates new entry and follow-on innovation.

81.     InterDigital engaged and continues to engage in anticompetitive conduct that does not further competition on the merits and is reasonably capable of creating and sustaining monopoly power in the Relevant Technology Markets.  As described earlier, InterDigital made intentionally false promises to the ITU that it would license its patented video codec technologies on RAND terms.  The ITU and its membership relied on those promises in choosing InterDigital's technology for inclusion in new releases of the Compression Standards instead of (i) adopting competing alternative technologies, or (ii) declining to promulgate a standard or new releases at all.

82.     InterDigital's false RAND commitments induced the ITU to adopt InterDigital's patented technologies.  Pursuant to paragraph 2.3 of the ITU's IPR Policy, the ITU

would not have considered InterDigital's technologies for inclusion in at least the H.265 standard and the Compression Standards' new releases if InterDigital had disclosed its intention not to license on RAND terms, or revealed its plan to falsely promise to license on RAND terms and then renege on those commitments following adoption of its technology. Rather, the ITU would have declined to adopt the H.265 standard or the new releases altogether, or relevant portions thereof, or it would have selected a competing alternative technology for adoption, per its IPR Policy.

83. InterDigital has harmed competition in the Relevant Technology Markets. InterDigital's deceptive promises to the ITU during the process of adopting the H.265 standard and new releases and versions of the Compression Standards excluded alternative technologies, and obscured the costs of including its patented technologies in the new releases and versions, increasing the likelihood that the ITU would continue including its patent rights and cement its monopoly power. InterDigital's wrongful conduct in conjunction with the ITU's standard-setting prevents Disney Enterprises and other implementers from obtaining access to necessary technology in the Relevant Technology Markets on reasonable and non-discriminatory terms.

84. As a consequence of InterDigital's unlawful monopolization, customers in the Relevant Technology Markets, including Disney Enterprises, face higher costs for access to technologies necessary for the streaming of standardized video content than they would have paid but for InterDigital's bait and switch, if they obtain them at all.

85. InterDigital exerts leverage over implementers of the Compression Standards, like Disney Enterprises, that InterDigital would not possess but for its false promises to license on RAND terms and its unlawful acquisition of monopoly power in the Relevant Technology Markets. Because of that leverage, Disney Enterprises and other implementers of the Compression Standards must either capitulate to InterDigital's supra-RAND licensing demands or

face the costs and risks of protracted global patent litigation and the corresponding threat of a loss of market access. The antitrust injury attributable to InterDigital's overall anticompetitive scheme is not limited to the supra-RAND royalties and non-RAND conditions that InterDigital attempts to extract from implementers, but it also includes the litigation fees and costs necessary to avoid the payment of supra-competitive licensing terms and exclusion from the marketplace.

86.    In the case of Disney Enterprises, the costs, duration, and threat of the foreign and domestic proceedings brought against it by InterDigital have been substantial and have represented a significant additional cost to Disney Enterprises' streaming business. Moreover, the threat of an injunction in significant foreign markets poses a major risk to Disney Enterprises' global streaming business. InterDigital's litigation tactics not only inflict antitrust injury on Disney Enterprises in the form of the substantial costs of litigation, but they also threaten to erode Disney Enterprises' global market share for its streaming services, early-mover advantages including in foreign streaming markets, worldwide reputation, and customer goodwill.

87.    In the absence of the injunctive relief requested herein, there is a substantial threat that Disney Enterprises will be forced to capitulate to InterDigital's supra-competitive and discriminatory licensing demands. The artificial imposition of higher costs on Disney Enterprises threatens a further loss of market share, as does the threat of injunctions in foreign jurisdictions. In whatever way InterDigital exploits its unlawfully-acquired monopoly power, the harm to Disney Enterprises is both imminent and irreparable, because market share—once lost in the streaming market—may never be recovered.

88.    As a direct and proximate result of InterDigital's unlawful monopolization, Disney Enterprises has suffered and will suffer irreparable injury to its business and property and is threatened with additional harm in the form of the loss of customers and potential customers,

the loss of product image and goodwill, and other irreparable harm to its streaming services. InterDigital's exclusionary conduct has prevented Disney Enterprises from obtaining access to necessary technology in the Relevant Technology Markets and, unless remedied, threatens to force Disney Enterprises to capitulate to InterDigital's demands.

89.    In addition to the harm to Disney Enterprises and other implementers of the Compression Standards, InterDigital's monopolistic conduct injures consumers of video streaming services and threatens them with further injury. InterDigital's misconduct raises the cost of access to all products and services that implement the Compression Standards. This unlawful tax on standard-compliant products drives up prices, reduces adoption of the Compression Standards, and hampers follow-on innovation.

## COUNT II: UNREASONABLE RESTRAINT OF TRADE IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1 (INTERDIGITAL, THOMSON LICENSING SAS, TECHNICOLOR SA)

90.    Disney Enterprises re-alleges and incorporates by reference the allegations set forth in paragraphs 1–89 above.

91.    InterDigital reached an agreement with Thomson Licensing SAS and Technicolor SA to acquire patents for the purpose of coordinating to increase the total royalties obtained from licensing those patents. Thomson and Technicolor negotiated to receive a share of the excessive royalties that InterDigital would collect, and intended that—through their conspiracy—InterDigital would extract non-RAND royalties from video-streaming providers (like Disney Enterprises) far beyond what Thomson and Technicolor could collect themselves in light of their RAND commitments.

92.    Thomson and Technicolor knew, intended, and agreed with InterDigital that InterDigital would demand non-RAND royalties from implementers of the Compression Standards

and threaten to enjoin implementers' services and products to increase its leverage in licensing negotiations.

93.     The agreement to transfer Thomson's and Technicolor's patents to InterDigital substantially raised prices, restricted output, and resulted in other anticompetitive effects in the Relevant Technology Markets, in addition to the downstream markets for streaming services.

94.     InterDigital, Thomson, and Technicolor intended to cause the inflated prices, restricted output, and other anticompetitive effects resulting from their agreement to transfer Thomson's and Technicolor's RAND-encumbered SEPs. The agreement had the purpose and effect of evading those RAND commitments and enabling InterDigital, Thomson, and Technicolor to share in the fruits of that evasion.

95.     The patent-transfer agreement did not generate any efficiencies. In fact, it was designed to create inefficiencies in the licensing of the SEPs and non-SEPs to Disney Enterprises and other potential licensees.

96.     The anticompetitive effects from the illegal agreement persist in the form of supra-RAND prices and other terms and conditions. And those effects have manifested in higher prices for consumers who purchase streaming services from implementers of the Compression Standards, including Disney Enterprises.

97.     As a direct result of this unlawful agreement, Disney Enterprises has suffered harm to its business and property, and absent an injunction, Disney Enterprises will continue to suffer from these effects. Disney Enterprises' past and continuing harm includes the threat of being forced to pay supra-RAND licensing rates—substantially higher than those it would

have had to pay but for the illegal agreement—business uncertainty, litigation costs, and business resources lost in dealing with the consequences of the unlawful agreements.

### COUNT III: DECLARATORY JUDGMENT OF RAND-ENCUMBRANCE, 28 U.S.C. §§ 2201-2202 (ALL DEFENDANTS)

98.    Disney Enterprises re-alleges and incorporates by reference the allegations set forth in paragraphs 1–97 above.

99.    InterDigital insists that it need not offer Disney Enterprises a RAND license to its patent portfolio because (i) some of its patents describe encoding technology, and (ii) encoding technology is an "optional" feature of the Compression Standards.

100.    That position contravenes the actual language of the Compression Standards and InterDigital's infringement contentions in worldwide litigation.  The parts of the Compression Standards that InterDigital accuses of infringement are mandatory, not optional. Using encoding technology is "optional" only in the sense that using the Compression Standards to perform compression at all is technically "optional."  No patented technology would ever be essential under that reading because Disney Enterprises and other implementers would always have the "option" of not implementing the Compression Standards and their techniques.

101.    InterDigital's position is further frustrated by the technology itself. InterDigital has licensed its video codec patents—those that it has declared essential to the Compression Standards and those it has not—to device makers whose products decode videos that have been encoded according to the Compression Standards.  InterDigital asserts that those licenses are necessary to practice the Compression Standards.  The licensed devices can only decode video compliant with the Compression Standards, thereby requiring video-content suppliers to conform to the Compression Standards.  InterDigital licensed the device makers to all video codec patents, including its declared video-codec SEPs, under allegedly RAND licensing

terms, but it now seeks to obtain a windfall by requiring further and supra-RAND royalties from video content suppliers. The devices are already licensed for their intended purpose but InterDigital seeks to collect again from content providers on supra-RAND terms under the fiction that encoding is not part of the Compression Standards.

102.    Notwithstanding that InterDigital routinely licenses all of its declared and undeclared video codec-related patents to device makers, it still insists that no one can use the Compression Standards to deliver video *content* to those devices without paying InterDigital separately.

103.    InterDigital seeks to coerce companies, like Disney Enterprises, that want to implement the Compression Standards to supply standard-compliant video to licensed devices. InterDigital forces content suppliers into purchasing licenses to its video codec patents at exorbitant royalties. But the devices are already licensed to InterDigital's video codec patents and therefore there is no need for an additional license.

104.    Left unredressed, InterDigital's groundless interpretation of its RAND obligations would enable it to shrug off those commitments, subvert the purposes of standardization, impede the dissemination of standardized technology, and further its "hold up" scheme based on its false RAND promises. The ITU's purpose in requiring those promises was to prevent exactly the type of patent-ambush strategy that InterDigital is currently deploying against Disney Enterprises.

105.    Moreover, upon information and belief, even if InterDigital's patents related to creating and delivering video content for devices compliant with the Compression Standards are found to be nonessential, InterDigital's routine practice is to license all its video codec patents, including both its encoding and decoding patents, together in portfolio licenses regardless of

whether they have been declared to ITU or have been interpreted as essential under ITU policies. As such, any offer of a license to a portion of those patents that may not be included in the standard or may have not been declared essential would be discriminatory and violate InterDigital's RAND commitments on the declared and/or otherwise RAND-encumbered patents.

106.    Accordingly, there exists an actual and justiciable controversy with respect to whether InterDigital's and its predecessors in interest's RAND promises encumber InterDigital's encoding patents.

107.    A judicial declaration concerning the application of InterDigital's and its predecessors in interest's RAND promises to the encoding patents is necessary and appropriate so that Disney Enterprises can ascertain its rights regarding those patents, and potentially bring other causes of action against InterDigital to the extent the Court concludes that InterDigital's RAND promises do not apply to its encoding patents.

## PRAYER FOR RELIEF

WHEREFORE, Disney Enterprises respectfully requests that this Court enter the following relief in its favor and against InterDigital:

A.    Judgment in favor of Disney Enterprises and against InterDigital;

B.    A declaration that InterDigital has monopolized the Relevant Technology Markets in violation of Section 2 of the Sherman Act and entered into a patent-privateering agreement that unreasonably restrained trade in violation of Section 1 of the Sherman Act;

C.    A declaration that each of InterDigital's U.S. patents declared by it to be essential to the Compression Standards is unenforceable;

D.    A declaration that each of InterDigital's U.S. patents that are in fact essential to the Compression Standards, even if undeclared, is unenforceable;

   E.  A declaration that any and all contracts or agreements that InterDigital has entered into in furtherance of its unlawful conduct are void;

   F.  A declaration that InterDigital's and its predecessors in interest's RAND promises apply with equal force to InterDigital's encoding patents;

   G.  An award of treble Disney Enterprises' damages, in an amount to be proven at trial, caused by InterDigital's monopolistic and anticompetitive conduct;

   H.  An order granting Disney Enterprises its attorneys' fees and costs; and

   I.  Such other and further relief as the Court deems just and proper.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Rodger D. Smith II*

OF COUNSEL:

Shawnna Yashar
Brian P. Quinn
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, DC  20006
(202) 383-5300

Michael F. Tubach
O'MELVENY & MYERS LLP
Two Embarcadero Center
28th Floor
San Francisco, CA  94111-3823
(415) 984-8700

August 8, 2025

Rodger D. Smith II (#3778)
Cameron P. Clark (#6647)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
rsmith@morrisnichols.com
cclark@morrisnichols.com

*Attorneys for Plaintiff*