## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

DISNEY ENTERPRISES, INC.,

      Plaintiff,

          v.

INTERDIGITAL, INC., INTERDIGITAL
VC HOLDINGS, INC., INTERDIGITAL
MADISON PATENT HOLDINGS, SAS,
INTERDIGITAL CE PATENT HOLDINGS,
SAS, VID SCALE, INC., VID SCALE
PATENTS, LLC, THOMSON LICENSING
SAS, AND TECHNICOLOR SA,

      Defendants.

C.A. No. 25-cv-996-MN

## STATEMENT OF INTEREST OF THE UNITED STATES OF AMERICA

JULIANNE E. MURRAY
*United States Attorney*

1313 North Market Street
Wilmington, DE 19801

ABIGAIL A. SLATER
*Assistant Attorney General*

DINA KALLAY
*Deputy Assistant Attorney General*

DAVID B. LAWRENCE
*Policy Director*

ALICE A. WANG
*Counsel to the Assistant Attorney General*

DANIEL E. HAAR
NICKOLAI G. LEVIN
SHANA WALLACE
*Attorneys*

U.S. Department of Justice
Antitrust Division
950 Pennsylvania Avenue, NW
Washington, DC 20530
Telephone: (202) 999-5025
Facsimile: (202) 514-0536
E-mail: Shana.Wallace@usdoj.gov

*Attorneys for the United States of America*

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

BACKGROUND ......................................................................................................... 2

    A.  Patent and Antitrust Laws Serve the Same Goal: Promoting Dynamic Competition .... 2

    B.  Standards Development Can Have Procompetitive and Anticompetitive Aspects ....... 4

    C.  Factual Allegations and Procedural History .................................................. 6

ARGUMENT .............................................................................................................. 9

    A.  Cognizable Antitrust Claim Under the Rule of Reason Must Adequately Allege Market Power ........................................................................................... 9

    B.  Cognizable Antitrust Claim Under the Rule of Reason Must Adequately Allege Harm to the Competitive Process .............................................................. 12

    C.  Seeking Judicial Redress is Exempt from Antitrust Liability Because it is Protected Activity under *Noerr-Pennington* ................................................ 16

CONCLUSION ......................................................................................................... 18

# TABLE OF AUTHORITIES

## Cases

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171 (9th Cir. 2016) ................................. 14

*Allied Tube v. Indian Head, Inc.*, 486 U.S. 492 (1988) ...................................................... 5, 14

*Apple, Inc. v. Motorola Mobility, Inc.*, 886 F. Supp. 2d 1061 (W.D. Wis. 2012) ................ 17, 18

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ........................................................................ 13

*Atari Games Corp. v. Nintendo of Am., Inc.*, 897 F.2d 1572 (Fed. Cir. 1990) ............................ 3

*Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297 (3d Cir. 2007) ......................... 4, 6, 10, 12, 13

*Brooke Group v. Brown & Williamson Tobacco*, 509 U.S. 209 (1993) ...................................... 14

*Cal. Dental Ass'n v. FTC*, 526 U.S. 756 (1999) ................................................................. 9

*Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508 (1972).................................. 16, 17

*Cap. Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*,

   996 F.2d 537 (2d Cir. 1993)........................................................................................... 14

*Continental Auto. Sys., Inc. v. Avanci, LLC*,

   No. 3:19-CV-02933-M 8 (N.D. Tex. Feb. 27, 2020)........................................................ 13, 15

*E. R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 127 (1961) ..................................... 16

*Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451 (1992) ............................... 10

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006).................................................... 17

*FTC v. AbbVie Inc.*, 976 F.3d 327 (3d Cir. 2020)..................................................... 2, 17

*Host Int'l, Inc. v. Marketplace, PHL, LLC*, 32 F.4th 242 (3d Cir. 2022) .................................. 14

*Hunt v. Crumboch*, 325 U.S. 821 (1945) ...................................................................... 14

*Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006) ......................................... 2, 10

*InterDigital, Inc., et al. v. The Walt Disney Company, et al.*, Case No. 2:25-cv-895 (C.D. Cal.).. 7

*Intergraph Corp. v. Intel Corp.*, 195 F.3d 1346 (Fed. Cir. 1999)................................................. 1

*Kartell v. Blue Shield*, 749 F.2d 922 (1st Cir. 1984) .................................................... 15

*Leegin Creative Leather Prods. v. PSKS, Inc.*, 551 U.S. 877 (2007) ........................................... 9

*Mayer v. Belichick*, 605 F.3d 223 (3d Cir. 2010) ............................................................ 7

*Microsoft Corp. v. Motorola, Inc.*, 795 F.3d 1024 (9th Cir. 2015)............................................ 15

*Nat'l Macaroni Mfrs. Ass'n v. FTC*, 345 F.2d 421 (7th Cir. 1965)................................................ 14

*Northern Pac. R. Co. v. United States*, 356 U.S. 1 (1958)............................................................... 9

*NYNEX Corp. v. Discon*, 525 U.S. 128 (1998) ....................................................................... 14, 16

*Ohio v. American Express, Co.*, 585 U.S. 529 (2018) ................................................................ 9, 10

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438 (2009) ........................................... 13

*Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49 (1993)........................ 17

*Radiant Burners, Inc. v. Peoples Gas Light & Coke Co.*, 364 U.S. 656 (1961)........................... 14

*Rambus Inc. v. FTC*, 522 F.3d 456 (D.C. Cir. 2008)....................................................................... 5

*Simpson v. Union Oil Co. of Cal.*, 377 U.S. 13 (1964) .................................................................... 3

*TCL Commc'ns Tech. Holdings, Ltd. v. Telefonaktienbolaget LM Ericsson*,

   2016 WL 7049263 (C.D. Cal. Aug. 9, 2016)............................................................................ 18

*United Mine Workers v. Pennington*, 381 U.S. 657 (1965)...................................................... 16, 17

*United States v. Addyston Pipe & Steel Co.*, 85 F. 271 (6th Cir. 1898) ....................................... 15

*United States v. Dentsply Intern., Inc.*, 399 F.3d 181 (3d Cir. 2005) ........................................... 10

*United States v. Microsoft, Corp.*, 253 F.3d 34 (D.C. Cir. 2001) ................................................... 3

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004) ............. 13

*Walker Process Equipment, Inc. v. Food Machinery and Chemical Corp.*, 382 U.S. 172 (1965) 17

*Weyerhaeuser v. Ross-Simmons Hardwood Lumb.*, 549 U.S. 312 (2007)..................................... 15

*ZF Meritor LLC v. Eaton Corp.*, 696 F.3d 254 (3d Cir. 2012).................................................... 12

## Statutes

15 U.S.C. § 1.................................................................................................................................... 8

15 U.S.C. § 2.................................................................................................................................... 8

15 U.S.C. § 4301.......................................................................................................................... 2, 5

28 U.S.C. § 517................................................................................................................................ 1

35 U.S.C. § 271................................................................................................................................ 2

U.S. Const. art. I, § 8, cl. 8.............................................................................................................. 2

**Rules**

Fed. R. Civ. P. 12(b)(6)................................................................................................ 6

**Other Authorities**

Douglas H. Ginsburg, et al., *The Troubling Use of Antitrust to Regulate FRAND Licensing*,
    Comp. Policy Int'l (Oct. 2015) ................................................................................ 16

Lisa Kimmel, *The Patent Market Power Fallacy: Recalibrating Market Power and Standard-
    Essential Patents*, 41 Licensing Journal 2 (Feb. 2021).................................... 6, 10, 11

Off. of Mgmt. and Budget, Revision of OMB Circular No. A-119, *Federal Participation in the
    Development and Use of Voluntary Consensus Standards and in Conformity Assessment
    Activities*, 81 Fed. Reg. 4673 (Jan. 27, 2016) ............................................................ 6

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and
    Their Application* ¶ 709d2 (5th ed. Sept. 2025 update) (VitalLaw) ........................... 4

U.S. Dep't of Justice & Fed. Trade Comm'n, Antitrust Enforcement and Intellectual Property
    Rights: Promoting Innovation and Competition (2007) ........................... 1, 4, 5, 6, 14

U.S. Dep't of Justice & Fed. Trade Comm'n, Antitrust Guidelines for the Licensing Of
    Intellectual Property (2017) ................................................................................. 1, 3

## INTERESTS OF THE UNITED STATES

The United States respectfully submits this statement pursuant to 28 U.S.C. § 517, which permits the Attorney General of the United States to direct any officer of the U.S. Department of Justice to attend to the interests of the United States in any case pending in a federal court. The United States, through the Department of Justice Antitrust Division, enforces the federal antitrust laws and has a strong interest in their correct application. The United States has a particular interest in this case because it involves a recurring issue at the intersection of antitrust law and intellectual property rights. The United States has long studied and gained considerable experience with ensuring that both antitrust and intellectual property laws are applied in a manner that promotes innovation and enhances consumer welfare, albeit "in different ways, both of importance to the nation." *Intergraph Corp. v. Intel Corp.*, 195 F.3d 1346, 1362 (Fed. Cir. 1999).[1]

In this case, Plaintiff Disney Enterprises, Inc. ("Disney") alleges that Defendant InterDigital, Inc. and seven related entities[2] (collectively, "InterDigital" or "Defendants") have sought to use their patent rights to violate the antitrust laws, and InterDigital has moved to dismiss the complaint or stay the litigation. D.I. 23. The United States takes no position on the resolution of the Motion, but files this statement to explain how courts have applied the antitrust laws to standards-development activity.[3] In particular, we urge the Court to hold that "a patent

---

[1] *See* U.S. Dep't of Justice & Fed. Trade Comm'n, Antitrust Guidelines for the Licensing Of Intellectual Property (2017), https://perma.cc/CH3G-XT6D; U.S. Dep't of Justice & Fed. Trade Comm'n, Antitrust Enforcement and Intellectual Property Rights: Promoting Innovation and Competition (2007), https://perma.cc/BD3B-MCJR.

[2] The other defendants are InterDigital VC Holdings, Inc., InterDigital Madison Patent Holdings, SAS, InterDigital CE Patent Holdings, SAS, VID SCALE, Inc., VID SCALE Patents, LLC, Thomson Licensing SAS, and Technicolor SA.

[3] In accordance with the terminology used by the United States Congress, this statement primarily uses the term "standards-development activity," *see* Standards Development

does not necessarily confer market power upon the patentee," *Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28, 45 (2006), including a patent declared as "essential" to a technology standard, that seeking higher prices is not, by itself, harm to the competitive process, and that InterDigital's litigation efforts to bring patent infringement claims are exempt from antitrust liability under the *Noerr-Pennington* doctrine given that InterDigital's "First Amendment right 'to petition the Government for a redress of grievances' is at stake," *FTC v. AbbVie Inc.*, 976 F.3d 327, 361 (3d Cir. 2020).

## BACKGROUND

### A.  Patent and Antitrust Laws Serve the Same Goal: Promoting Dynamic Competition

The U.S. patent regime, rooted in Article I, Section 8 of the Constitution, allows the market process to determine how best to reward inventors for their technological advances. With a constitutional guarantee of "exclusiv[ity]," U.S. Const. art. I, § 8, cl. 8; 35 U.S.C. § 271, inventors may reap the benefits of their investments in research and development by marketing and selling their new technologies, or by licensing their patent rights to others. The guarantee of market-driven financial rewards is a powerful incentive for inventors to invest in developing new technologies. Such innovation is essential to a vibrant free market, and strong intellectual property rights help facilitate market entry and level the competitive playing field for small innovative companies. Without strong IP protection, a larger firm is generally better able to misappropriate smaller companies' innovations. The U.S. patent regime reduces the influence of market size and market share on the ability to innovate and the capacity to compete.

---

Organization Advancement Act of 2004, Pub. L. No. 108-237, 15 U.S.C. § 4301 et seq., although the term "standards-setting activity" is often used interchangeably. Similarly, the organizations that oversee this activity are often referred to as either "standards-development organizations" ("SDOs") or "standards-setting organizations" ("SSOs").

The antitrust laws also seek to strengthen the essential cycle of competition and innovation and are "*in pari materia*" with the intellectual property laws, *Simpson v. Union Oil Co. of Cal.*, 377 U.S. 13, 24 (1964), "shar[ing] the common purpose of promoting innovation and enhancing consumer welfare," U.S. Dep't of Justice & Fed. Trade Comm'n, Antitrust Guidelines for the Licensing Of Intellectual Property §1.0 at 2 (2017), https://perma.cc/CH3G-XT6D ("IP Guidelines"); *see also Atari Games Corp. v. Nintendo of Am., Inc.*, 897 F.2d 1572, 1576 (Fed. Cir. 1990) ("[T]he aims and objectives of patent and antitrust laws may seem, at first glance, wholly at odds. However, the two bodies of law are actually complementary, as both are aimed at encouraging innovation, industry and competition.").

Like the patent laws, the antitrust laws rely on free markets as the best means of allocating resources and determining prices. Indeed, in safeguarding a robust competitive process, antitrust law is about more than just prices. For instance, high demand for a creative new product might drive up its price, but consumers are provided with more innovative products. Antitrust law promotes rather than punishes this dynamic because it gives others an incentive to innovate and compete on product quality—all for the benefit of consumers. Rather than focusing on price in isolation, antitrust law protects consumers from practices that *harm competition*—that is, they diminish the "competitive *process*" in a manner that harms consumers, potentially in the form of non-competitive prices, but also through lowered output, reduced innovation, or a deprivation of consumer choice. *See United States v. Microsoft, Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001) (en banc) (per curiam) (emphasis in original). In this regard, the policies of the patent and antitrust laws are aligned in their aim of fostering dynamic competition by ensuring that innovators have adequate incentives to invest in, and monetize, their technological advances.

**B.  Standards Development Can Have Procompetitive and Anticompetitive Aspects**

Collaborative industry standards are an integral component of modern markets. Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 709d2 (5th ed. Sept. 2025 update) (VitalLaw) ("One almost omnipresent feature of information technologies is standard setting, driven by the need for compatibility across networks that contain numerous participants."). By ensuring the interoperability of a wide range of related products, common standards "make products less costly for firms to produce and more valuable to consumers." U.S. Dep't of Justice & Fed. Trade Comm'n, Antitrust Enforcement and Intellectual Property Rights: Promoting Innovation and Competition at 6 (2007), https://perma.cc /BD3B-MCJR ("2007 Antitrust-IP Report"). By pooling together companies' cutting-edge technologies and ensuring interoperability, standards development also helps fuel dynamic competition by ensuring market-wide acceptance of the most innovative new technologies.

Standards are adopted through a variety of means. Firms might unilaterally compete in a "winner-take-all standards war" to see their individual technology become the *de facto* standard, as happened with VCR and Betamax. 2007 Antitrust-IP Report at 34. In many cases, however, standards are adopted collaboratively through voluntary consensus-based SDOs, a process in which firms come together to develop "a standard that all firms, regardless of whether they participate in the process, then can use in making products." *Id.* at 33. Employing an SDO helps "avoid many of the costs and delays of a standards war, thus substantially reducing transaction costs to both consumers and firms." *Id.* at 34. Thus, in the SDO context, competition among firms occurs mostly *ex ante,* before the standard is adopted rather than after. *See Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 309 (3d Cir. 2007) ("The adoption of a standard does not eliminate competition among producers but, rather, moves the focus away from the development

of potential standards and toward the development of means for implementing the chosen standard."); *Rambus Inc. v. FTC*, 522 F.3d 456, 459 (D.C. Cir. 2008) (noting that standardization "shifts" competition so that it occurs "[b]efore an [SDO] adopts a standard"); *see also* 2007 Antitrust-IP Report at 34. Once the winning technical solutions are selected for a finally adopted standard, rendering the included patents essential ("standard essential patents" or "SEPs"), that competition for inclusion of a technology into a standard is generally replaced by consensus as industry participants begin implementing the standard. Any given standard may, however, compete against another standard or standards or any number of non-standardized technologies.

The Supreme Court has recognized that "private standards can have significant procompetitive advantages," such as promoting interoperability, generating network effects, and incentivizing innovation, but only when SDOs promulgate them "through procedures that prevent the standard-setting process from being biased by members with economic interests in stifling product competition." *Allied Tube v. Indian Head, Inc.*, 486 U.S. 492, 501 (1988). The Court was sensitive to the fact that, because standards development involves cooperation between firms, including competing ones, it comes with a risk that the firms will seek to abuse the process and harm competition for their own advantage, making SDO processes frequent "objects of antitrust scrutiny." *Id.* at 500.[4]

---

[4] In antitrust lawsuits, collective standards-development activity has typically been analyzed under the effects-based rule of reason approach, which weighs the procompetitive benefits of the conduct against its potential anticompetitive effects. *Allied Tube*, 486 U.S. at 501; *see also* 2007 Antitrust-IP Report at 37. Rule-of-reason treatment may not be appropriate, however, if the standardization is merely cover for conduct condemned as *per se* illegal under the Sherman Act, such as price fixing—conduct that Disney has not alleged here. *See* 2007 Antitrust-IP Report at 37 (giving examples of *per se* illegal activities among members of an SDO); 15 U.S.C. § 4301(c)(3) (excluding "any agreement or conspiracy that would set or restrain prices of any good or service" from the definition of "standards development activity" subject to the rule-of-reason by the Standards Development Organization Advancement Act).

Thus, SDOs often adopt procedural safeguards, such as requiring patent holders to disclose their relevant patents and indicate whether they intend to offer future access to their SEPs on reasonable and nondiscriminatory ("RAND") terms.[5] The RAND commitment is an important contractual mechanism that facilitates patent licensing and protects against any exercise of potential market power that otherwise might be conferred by inclusion of proprietary technology in the standard.[6] It therefore cannot be presumed that SEP holders have gained substantial market power by inclusion in a standard given that substitutable technology may still be available; and to the extent the patent holder's market power has increased, contractual obligations (such as RAND commitments) typically limit its exercise. *Broadcom*, 501 F.3d at 314 ("FRAND commitments become important safeguards against monopoly power"); 2007 Antitrust-IP Report at 46-48; Lisa Kimmel, *The Patent Market Power Fallacy: Recalibrating Market Power and Standard-Essential Patents*, 41 Licensing Journal 2, at 2-3 (Feb. 2021).

### C. Factual Allegations and Procedural History

Disney sells video streaming services such as Hulu, Disney+, and ESPN+ that rely on patented technology for the compression and decoding of video. D.I. 1, Compl. ¶¶ 10-14.[7] This

---

[5] Different SDOs utilize the terms "RAND" or "FRAND." While the meaning of the term is determined by the specific SDO's patent policy, the differences among them are not material to the arguments here. Hence, this statement utilizes them interchangeably.

[6] *See* Off. of Mgmt. and Budget, Revision of OMB Circular No. A-119, *Federal Participation in the Development and Use of Voluntary Consensus Standards and in Conformity Assessment Activities*, 81 Fed. Reg. 4673 at 2(d), 5(a)(v) (Jan. 27, 2016), https://perma.cc/QNC6-ZLR9 (recognizing that standards-development bodies often have patent policies "that include provisions requiring that owners of relevant patented technology incorporated into a standard make that intellectual property available to implementers of the standard on nondiscriminatory and royalty-free or reasonable royalty terms").

[7] Unless otherwise noted, this statement draws its factual discussion from Disney's complaint. When weighing dismissal under Fed. R. Civ. P. 12(b)(6), the court "must accept all factual allegations in the complaint as true, construe the complaint in the light favorable to the plaintiff,

patented technology has been incorporated into industry-wide standards commonly known as H.264 and H.265, which were developed and promulgated through various SDOs.[8] Compl. ¶¶ 33-40. InterDigital holds thousands of licenses relevant to video coding, some of which are essential to Disney's streaming products. Compl. ¶¶ 56-58.

InterDigital and Disney are engaged in patent litigation in other jurisdictions. For example, on February 2, 2025, InterDigital sued Disney and its related streaming entities in the Central District of California for infringing upon five of InterDigital's patents, alleging that a yearslong negotiation process had failed to result in Disney paying to license the patents. *InterDigital, Inc., et al. v. The Walt Disney Company, et al.*, D.I. 1, Complaint ¶¶ 1-4, Case No. 2:25-cv-895 (C.D. Cal.). On March 31, 2025, Disney filed its Answer, which included fifteen affirmative defenses and twenty-three counterclaims (e.g., breach of contract, promissory estoppel, and breach of duty of good faith), but no allegations of antitrust violations. Case No. 2:25-cv-895 D.I. 42. InterDigital has also sued Disney to enforce its patents in Brazil, as well as in Germany and the Unified Patent Court ("UPC"). On May 27, 2025, the UPC's Mannheim Local Division granted an anti-anti-suit injunction to InterDigital, to counter Disney's efforts to obtain an anti-suit injunction in the California litigation. Case No. 2:25-cv-895 D.I. 75-1. On September 11, 2025, the Brazilian court issued a preliminary injunction over Disney's infringement of two of InterDigital's patents based on the finding of an independent expert

---

and ultimately determine whether plaintiff may be entitled to relief under any reasonable reading of the complaint." *Mayer v. Belichick*, 605 F.3d 223, 229 (3d Cir. 2010).

[8] The development of video compression/decompression standards has been guided by a United Nations specialized agency for digital technologies, the International Telecommunications Union ("ITU"), and associated SDOs. Compl. ¶¶ 33-37.

report. *See* InterDigital's Memorandum in Support of Its Motion to Dismiss, D.I. 24 at 17, Case No. 25-cv-0996 (D. Del.).

In the present litigation, Disney sued InterDigital on August 8, 2025, in the District of Delaware alleging that InterDigital has engaged in "abusive patent-licensing practices and unlawful monopolization in relevant markets for video compression and streaming technology," in violation of Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1, 2).[9] Compl. ¶ 2. Specifically, Disney alleges that InterDigital carried out its "unlawful scheme to acquire, exploit, and maintain monopoly power over the technology to encode and decode content for video streaming," in violation of Section 2, by "falsely promis[ing] to license its video codec patents on RAND terms," "manipulating the standard-setting process to exclude alternative technologies," and "[r]efusing to honor its [RAND] obligation" by demanding "excessive and discriminatory royalties from companies . . . that provide video-streaming services." Compl. ¶¶ 10-11, 79, 82.

Disney also alleges that InterDigital has violated Section 1 by acquiring the patents of its co-defendants "for the purpose of coordinating to increase the total royalties obtained from licensing those patents" and "evading" its co-defendants' RAND commitments, which has "substantially raised prices, restricted output, and resulted in other anticompetitive effects." Compl. ¶¶ 91-94. Finally, Disney alleges that InterDigital has "exert[ed] leverage over" Disney through the imposition of the "litigation fees and costs necessary to avoid payment of [non-RAND] licensing terms" based upon "the threat of an injunction in significant foreign markets" and other "litigation tactics." Compl. ¶¶ 85-86. Disney claims that InterDigital's conduct "threatens to erode [Disney's] global market share for its streaming services, early-mover

---

[9] This statement does not address Disney's third count, requesting a Declaratory Judgment of RAND-encumbrance. *See* Compl. ¶¶ 98-107.

advantages including in foreign streaming markets, worldwide reputation, and customer goodwill," while "injur[ing] consumers" by "driv[ing] up prices, reduc[ing] adoption of the Compression Standards, and hamper[ing] follow-on innovation." Compl. ¶¶ 86, 89.

On September 30, 2025, InterDigital moved to dismiss Disney's claims or, in the alternative, for a stay of the litigation. D.I. 23.

## ARGUMENT

Properly interpreted, the antitrust laws should promote competition and avoid harming the incentives for innovation provided by patents and the standards-development ecosystem. In reviewing the Complaint here, the court should decline any invitation to rely on conclusory allegations to presume that the elements of a rule-of-reason claim are satisfied. In particular, the Court should not find market power to be adequately alleged simply on the basis of SEP status; nor should it conclude that allegedly charging high prices, by itself, harms competition. In addition, the court should not deem protected petitioning activity a violation of the antitrust laws. To hold otherwise could reduce the incentives for patent holders to participate in procompetitive standards-development activity, chill innovation, and deter protected petitioning activity.

## A. A Cognizable Antitrust Claim Under the Rule of Reason Must Adequately Allege Market Power

Market power is typically required to show a Sherman Act Section 1 violation,[10] and monopoly power is typically required to show a Sherman Act Section 2 monopolization

---

[10] Section 1 of the Sherman Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. "Although this prohibition is literally all-encompassing, the courts have construed it as precluding only those contracts or combinations which 'unreasonably' restrain competition." *Northern Pac. R. Co. v. United States*, 356 U.S. 1, 5 (1958); *see also Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 885 (2007). Disney has not alleged conduct that calls for a per se analysis. *See* supra n. 4. Thus, unless Disney invokes a truncated rule of reason, *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 779 (1999), or provides actual evidence of anticompetitive effect, a court is required to "conduct a

violation.[11] The complaint here falls short of these requirements. Disney claims that InterDigital "commands monopoly power in the Relevant Technology Markets"[12] because it is "the sole supplier in those markets with a dominant market share" and "[t]here are significant barriers to entry," including "the standardization process itself." Compl. ¶¶ 79-80. It is axiomatic that "a patent does not necessarily confer market power upon the patentee." *Ill. Tool Works*, 547 U.S. at 44. This Circuit has observed that the value of a patent "becomes significantly enhanced, however, after the patent is incorporated in a standard." *Broadcom Corp.*, 501 F.3d at 314. But it is under "such circumstances that measures such as FRAND commitments become important safeguards against monopoly power." *Id.*

There should thus be no presumption of market power simply because a patent has been incorporated into a standard, without an assessment of the alternatives to the standard and the contractual obligations and commitments the patent holder has undertaken under the SDO's

---

fact-specific assessment of market power and market structure," *Ohio v. American Express, Co.*, 585 U.S. 529, 541, 543 n.7 (2018).

[11] *United States v. Dentsply Intern., Inc.*, 399 F.3d 181, 186 (3d Cir. 2005) ("A violation of Section 2 consists of two elements: (1) possession of monopoly power and (2) ' . . . maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.'") (quoting *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 480 (1992). And "[m]onopoly power under § 2 requires . . . something greater than market power under § 1." *Eastman Kodak*, 504 U.S. at 481.

[12] The Complaint defines the "Relevant Technology Markets" to "include the markets for technologies covered by the Thomson and/or InterDigital codec patents issued in the United States and elsewhere that are essential, or are alleged to be essential, to the 'Compression Standards,' together with all other alternative technologies to the Thomson and/or InterDigital patents that could have been used in the Compression Standards and accompanying releases," with a geographic market that "is global in nature." Compl. ¶ 75. This statement takes no position on the sufficiency of the claimed relevant market, which Disney advises can be ascertained by locating and reviewing defendants' "submitted declarations of essentiality to the ITU" in which "the markets for those technologies can be identified by those licensing declarations and proposals." *Id.*

patent policy limiting any potential market power. Kimmel, *The Patent Market Power Fallacy* at 2-3. This is particularly so where a "technology user may view infringement or strategic delay as a good alternative to a license, at least for some period of time" due to the ease of misappropriation and the difficulty patent owners face in stopping the infringing use. *Id.* at 2 & n. 22 (noting misappropriation is especially easy "where standards essential patents are concerned" because "the publicly available technical standards typically provide th[e] detailed know-how and blue-prints for implementation/infringement").

The Complaint alleges that InterDigital has undertaken numerous commitments pursuant to the intellectual property policies of the SDO in the present case. These requirements allegedly include an obligation that the patent holder disclose "any known patent" during the standard-setting process, as well as be "bound to the ITU . . . for the benefit of third-party implementers to offer to license on RAND terms," including for patents that are similarly RAND-assured and transferred to an assignee. Compl. ¶¶ 43-50. Disney also alleges that both InterDigital and its co-defendants "submitted numerous declarations to the ITU and its associated SSOs promising to license its SEPs to implementers of the Compression Standards on RAND terms." Comp. ¶¶ 51-59. In addition, Disney outlines the legal principles that limit the patent holder's pricing power in a dispute with a potential licensee over RAND terms, including: (i) that a patent holder "cannot charge a premium" based on its SEP status; (ii) "the total royalty must be reasonable"; (iii) "the demands of any individual patent holder must be assessed in light of the total number of SEPs included in the standard"; and (iv) patent-exhaustion law applies to "qualify SEP holders' rights" such that they "may not 'double dip' and extract multiple royalties for the use of the same patented invention from firms at different points in the supply chain." Compl. ¶¶ 31-32.

This litany of SDO obligations and legal principles tends to limit InterDigital's ability to

exercise market power  The allegations, however, are not accompanied by an identification of potential alternative technologies, nor an explanation of why InterDigital's exercise of market power is not limited by those multiple SDO obligations and legal principles, even though they serve in part as the basis of Disney's affirmative defenses and counterclaims in its ongoing California patent litigation with InterDigital. *InterDigital, Inc., et al. v. The Walt Disney Company, et al.*, D.I. 42, Defendants' Answer, Affirmative Defenses, and Counterclaims ¶ 586 (affirmative defense regarding "FRAND Damages Limitation"), ¶¶ 1-3 (counterclaims that, *inter alia*, InterDigital "breached its contractual obligation to offer [RAND] terms and conditions") Case No. 2:25-cv-895 (C.D. Cal.).

## B. Cognizable Antitrust Claim Under the Rule of Reason Must Adequately Allege Harm to the Competitive Process

The Complaint is also lacking in its identification of anticompetitive or exclusionary conduct that harms competition. To succeed in bringing an antitrust claim under the rule of reason, including in cases involving patents or technology, a private plaintiff ordinarily must not only allege the existence of market power (as discussed above), but must identify conduct that has harmed the competitive process. *Broadcom*, 501 F.3d at 306-08; *ZF Meritor LLC v. Eaton Corp.*, 696 F.3d 254, 269 n.9, 310 n.8 (3d Cir. 2012).

Disney first alleges that InterDigital "manipulated the standard-setting process to exclude alternative technologies" by making "deceptive promises," and "never intended to license its patents on RAND terms." Compl. ¶¶ 10, 61, 83-84. To the extent that Disney alleges harm to the competitive SDO process that existed prior to the adoption of the technological standard, that claim invokes *Broadcom*. In that case, the Third Circuit held that "a patent holder's intentionally false promise to license essential proprietary technology on FRAND terms . . . coupled with an SDO's reliance on that promise when including the technology in a standard," could constitute

exclusionary conduct. *Broadcom*, 501 F.3d at 314.[13] Under this theory, it is the distortion of the competitive process, not the level of the royalty rate later demanded by the patent owner, that implicates the antitrust laws. *Id.* at 313–14. Disney's allegations of fraud during the competitive SDO standards-development process, however, appear largely conclusory.[14] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Disney's other allegations fail to establish harm to competition as they are aimed at conduct that occurred after the competitive period of standard adoption. For example, the Complaint focuses on InterDigital's allegedly supra-RAND licensing demands, but charging high prices does not by itself constitute exclusionary conduct. *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004) ("The mere possession of monopoly power, and the concomitant charging of monopoly prices, is not only not unlawful; it is an important element of the free-market system."); *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 447–48 (2009) ("Simply possessing monopoly power and charging monopoly prices does not violate § 2."). Nor is antitrust law "intended to be as available as an over-the-counter cold remedy" for contract or tort disputes, "because were its heavy power brought into

---

[13] This statement recognizes that this Court must follow *Broadcom*, though it has been rejected elsewhere. *See Continental Auto. Sys. v. Avanci*, 485 F.Supp.3d 712 (N.D. Tex. 2020) (holding that "[t]he Court does not agree with those cases concluding that deception of an SSO constitutes the type of anticompetitive conduct required to support a § 2 claim"), *aff'd on appeal* at 2022 WL 2205469 at *1 (5th Cir. June 21, 2022) (per curiam) ("Having reviewed the district court's detailed order . . . we affirm the judgment of the district court that Continental failed to state claims under Sections 1 and 2 of the Sherman Act.").

[14] This statement does not take a position on the specific pleading standard that must be met to the extent material fraudulent misrepresentations or omissions during the competitive SDO standards-development process can provide the basis for an antitrust claim. *See Broadcom*, 501 F.3d at 315 n.9 (not reaching the issue because it was "not developed by the parties," but noting that "[a]nalogous claims for inequitable conduct before the United States Patent and Trademark Office must be pled with particularity"), citing *Cent. Admixture Pharmacy Servs., Inc. v. Advanced Cardiac Solutions, P.C.*, 482 F.3d 1347, 1356 (Fed. Cir. 2007).

play too readily it would not safeguard competition, but destroy it." *Capital Imaging Assocs.,
P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 539 (2d Cir. 1993); *see also Brooke
Group v. Brown & Williamson Tobacco*, 509 U.S. 209, 225 (1993), quoting *Hunt v. Crumboch*,
325 U.S. 821, 826 (1945) ("even an act of pure malice" cannot, "without more, state a claim
under the federal antitrust laws"). Thus, "a breakdown in contract negotiations is outside the
Sherman Act's scope," and "[a]n objectionable term in a commercial agreement, without more,
is not an antitrust violation." *Host Int'l, Inc. v. Marketplace, PHL, LLC*, 32 F.4th 242, 250 (3d
Cir. 2022).

Moreover, even if InterDigital's alleged attempt to negotiate for supra-RAND terms (both
for its original patents and those acquired from its co-defendants) violated its contractual
obligations, that would not, in and of itself, constitute exclusionary or anticompetitive conduct
cognizable under the antitrust laws.[15] *See, e.g.*, *NYNEX Corp. v. Discon*, 525 U.S. 128, 136-37
(1998). Similarly, it is not necessarily exclusionary conduct to decline to license a product on a
potential licensee's preferred terms. *Cf. Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d
1171, 1184 (9th Cir. 2016) (an antitrust violation requires alleging more than that plaintiff

---

[15] The result under Section 1 is no different here as the Complaint's Section 1 claim is purely
derivative of its Section 2 allegations—i.e., that post-standards development, InterDigital and its
co-defendants "commence[d] a patent-transfer scheme" to "circumvent the RAND obligations"
of all defendants' patents. Compl. ¶ 55; *see also* Compl. ¶ 91 (defendants agreed to coordinate
"to increase the total royalties obtained from licensing th[eir] patents" and "extract non-RAND
royalties"). In particular, Disney does not allege any joint conduct that might have restrained
competition—such as that defendants conspired to engage in "the manipulation of the standard-
setting process or the improper use of the resulting standard to gain competitive advantage over
rivals," 2007 Antitrust-IP Report at 34-35; or that their joint conduct during the standards-setting
process facilitated price-fixing, *see Nat'l Macaroni Mfrs. Ass'n v. FTC*, 345 F.2d 421, 426 (7th
Cir. 1965); or that they jointly used the standards-development process to go beyond the
requirements for achieving a voluntary standard and decided which products, from which
competitors, would be sold in the market, *see Radiant Burners, Inc. v. Peoples Gas Light & Coke
Co.*, 364 U.S. 656, 658-60 (1961); or that they manipulated the standards-development process to
thwart a new rival and prevent a "competitive threat," *see Allied Tube*, 486 U.S. at 496.

14

"simply did not like the business terms offered by" defendant). The scenario alleged here—whereby SEP holders made contractual commitments to an SDO to license their patents on RAND terms and later sought supra-RAND terms—does not change the antitrust analysis: specifically, a patent holder is not obliged by antitrust law to license its product on any specific terms, including price.

Indeed, hinging antitrust liability on whether a patent holder violated its RAND commitment, as Disney alleges here, *see* Compl. ¶¶ 103, 105, would create a "sea of doubt" in standards development, *see United States v. Addyston Pipe & Steel Co.*, 85 F. 271, 283-284, 293 (6th Cir. 1898) (Taft, J.) (rejecting a standard for Sherman Act liability premised in part on whether a cartel that eliminated competition fixed "reasonable" prices), *aff'd as modified*, 175 U.S. 211 (1899). The Supreme Court has cautioned that uncertainty will arise from a liability rule based on an assessment of whether prices were "fair" or reasonable. *See Weyerhaeuser v. Ross-Simmons Hardwood Lumb.*, 549 U.S. 312, 317, 323-25 (2007). As the United States has explained, a RAND commitment, "is, by design, indefinite and requires *ex post* negotiation" by sophisticated parties that will implement the standard. Statement of Interest of the United States, *Continental Auto. Sys., Inc. v. Avanci, LLC*, No. 3:19-CV-02933-M 8, 15-16 (N.D. Tex. Feb. 27, 2020). Antitrust law should not police the prices set by such negotiations for "reasonable[ness]." *See Kartell v. Blue Shield*, 749 F.2d 922, 927-28 (1st Cir. 1984) (Breyer, J.).

In addition, sound policy counsels against allowing a litigant with a contractual damages claim to instead seek treble damages in an antitrust action. Contract remedies (such as those sought by Disney in its Counterclaims to InterDigital's infringement lawsuit pending in California) can provide a sufficient means to redress any breached RAND commitment. *See, e.g.*, *Microsoft Corp. v. Motorola, Inc.*, 795 F.3d 1024, 1040-45 & n.13 (9th Cir. 2015) (upholding

district court's analysis of RAND rate and range in breach of contract action). Any rule to the contrary would incentivize bad faith bargaining on the part of a potential licensee who would have more to gain from failing to reach a deal. In fact, the Supreme Court has cautioned against "transform[ing] cases involving business behavior that is improper for various reasons . . . into treble-damages antitrust cases." *NYNEX Corp.*, 525 U.S. at 136-37; *see also* Douglas H. Ginsburg, et al., *The Troubling Use of Antitrust to Regulate FRAND Licensing*, at 3, Comp. Policy Int'l at (Oct. 2015) ("[I]mposing antitrust liability for patent holdup and a patent holder's refusals to issue a license on FRAND terms is not only unnecessary, given that the law of contracts is sufficient to provide optimal deterrence, it is likely to be harmful to both competition and consumers by diminishing the value of patents and hence reducing incentives to innovate and to participate in standard setting.").

### C. Seeking Judicial Redress is Exempt from Antitrust Liability Because it is Protected Activity under *Noerr-Pennington*

Finally, Disney argues that it has suffered the harm of paying "the litigation fees and costs" stemming from "the foreign and domestic proceedings brought against it by InterDigital." Comp. ¶¶ 85-86. Disney argues that even "the threat of an injunction in significant foreign markets," along with other "litigation tactics . . . inflict antitrust injury on Disney Enterprises in the form of substantial costs of litigation" and "threaten to erode [their] global market share for its streaming services, early-mover advantages including in foreign streaming markets, worldwide reputation, and customer goodwill." *Id*. But seeking judicial redress is protected from antitrust liability by the *Noerr-Pennington* doctrine. *E. R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 127, 135 (1961); *United Mine Workers v. Pennington*, 381 U.S. 657, 670 (1965); *see also Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972)

(clarifying that the doctrine extends to "[t]he right of access to the courts," which is "but one aspect of the right of petition").

Based on First Amendment principles, the *Noerr-Pennington* doctrine exempts parties petitioning the government from antitrust liability, even when such petitioning may be considered anticompetitive. *Pennington*, 381 U.S. at 670 ("*Noerr* shields from the Sherman Act a concerted effort to influence public officials regardless of intent or purpose"). For a court to hold otherwise and find that an entity is "violating the antitrust laws [due to their] use [of] the channels and procedures of state and federal agencies and courts to advocate their causes and points of view respecting resolution of their business and economic interests" would be "destructive of rights of association and of petition." *Cal. Motor*, 404 U.S. at 510-11.

Thus, exercising the right to seek judicial redress cannot serve as the basis for an antitrust claim absent application of a  "sham" litigation exception or, in the patent context, an assertion that a patent has been obtained by fraud (a *Walker* Process claim)—neither of which has plaintiff alleged here.[16] *See FTC v. AbbVie, Inc.*, 976 F.3d 327, 360-61 (3d Cir. 2020); *Walker Process Equipment, Inc. v. Food Machinery and Chemical Corp.*, 382 U.S. 172, 179-80 (1965) (Harlan, J., concurring). Patent holders, including SEP holders that have made a FRAND commitment, should not face antitrust liability and treble damages for seeking judicial redress—including

---

[16] "Sham" litigation that is brought solely to harm a competitor can form the basis of an antitrust claim. *See Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60-61 (1993) (holding that a legal action is immunized from antitrust liability unless it is "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits" and "the baseless lawsuit conceals an attempt to interfere directly with the business relationships of a competitor, through the use of the governmental process—as opposed to the outcome of that process—as an anticompetitive weapon") (internal quotation marks, citations, emphases, and alterations omitted); *Cal. Motor,* 404 U.S. at 513 ("a pattern of baseless, repetitive claims may emerge which leads the factfinder to conclude that the administrative and judicial processes have been abused").

injunctive relief—for infringement of such patents.[17] *See, e.g.*, *Apple, Inc. v. Motorola Mobility, Inc.*, 886 F. Supp. 2d 1061, 1076 (W.D. Wis. 2012) (holding that defendant's "enforcement of its patents is privileged conduct protected by the First Amendment, [and thus] the *Noerr-Pennington* doctrine applies); *TCL Commc'ns Tech. Holdings, Ltd. v. Telefonaktiebolaget LM Ericsson*, 2016 WL 7049263, at *2 (C.D. Cal. Aug. 9, 2016) (granting defendant's summary judgment motion because defending against "injunctions or exclusion orders . . . cannot be the basis for [plaintiff's] 'economic injury' due to the *Noerr-Pennington* doctrine").

---

[17] The Supreme Court has held that injunctions to remedy patent infringement are governed by equitable principles and courts should not depart from these principles in favor of categorical standards. *See eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391-94 (2006); *see also Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1331-32 (Fed. Cir. 2014) ("The framework laid out by the Supreme Court in *eBay*, as interpreted by subsequent decisions of this court, provides ample strength and flexibility for addressing the unique aspects of [RAND] committed patents and industry standards in general," and thus "an injunction may be justified where an infringer unilaterally refuses a [RAND] royalty or unreasonably delays negotiations to the same effect.").

**CONCLUSION**

For the foregoing reasons, the United States respectfully requests that the Court apply these settled interpretations of the antitrust laws when ruling upon the pending Motion to Dismiss or Stay the Litigation.

Respectfully submitted,

ABIGAIL A. SLATER
*Assistant Attorney General*

JULIANNE E. MURRAY
*United States Attorney*

DINA KALLAY
*Deputy Assistant Attorney General*

MARK H. HAMER
*Deputy Assistant Attorney General*

DAVID B. LAWRENCE
*Policy Director*

ALICE A. WANG
*Counsel to the Assistant Attorney General*

DANIEL E. HAAR
NICKOLAI G. LEVIN
SHANA WALLACE
*Attorneys*

Dated: October 6, 2025                    /s/ Shana Wallace
                                          SHANA WALLACE

                                          *Attorneys for the United States of America*