**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| DISNEY ENTERPRISES, INC., | : |
| | : |
| *Plaintiff*, | : |
| | : |
| | :  C.A. No. 25-996-MN |
| v. | : |
| | : |
| INTERDIGITAL, INC., et al., | : |
| | : |
| *Defendants*. | : |

**[PROPOSED] AMICUS CURIAE BRIEF OF ACT | THE APP ASSOCIATION**

Dated: November 21, 2025

Anne Shea Gaza (No. 4093)
Adam W. Poff (No. 3990)
YOUNG CONAWAY STARGATT &
TAYLOR, LLP
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
(302) 571-6600
agaza@ycst.com
apoff@ycst.com

Brian Scarpelli
ACT | THE APP ASSOCIATION
1401 K St., NW
Suite 501
Washington, DC 20005
(517) 507-1446
bscarpelli@actonline.org

*Attorneys for The App Association*

# TABLE OF CONTENTS

INTEREST OF AMICI CURIAE ............................................................................. 1

BACKGROUND .................................................................................................... 2

    A.  Small Businesses Depend on Fair and Predictable SEP Ecosystems ............................ 2

        1.     The Importance of the FRAND Commitment in Standardization ..................... 4

             a.  The Power Imbalances in SEP Licensing ..................................................... 6

             b.  SEP Holders Systematically Evade FRAND Commitments Through
Coercive Tactics and Information Asymmetry ............................................ 7

        2.     How Information Asymmetry in SEP Negotiations Advantages Licensors ....... 8

        3.     The Impact of Power Imbalances in SEP Licensing on Small
Businesses and Emerging Industries................................................................. 10

ARGUMENT ........................................................................................................ 12

    A.  SEP Holders That Obtain Supra-FRAND Royalties Are Exercising
Market Power ..................................................................................................12

    B.  Breach of FRAND Constitutes Anticompetitive Conduct and Harms
the Market ........................................................................................................ 13

    C.  Robust Judicial Review is Essential to Enforce the FRAND Bargain......................... 15

        1.     Disney's Pleadings Satisfy Rule 12(b)(6) Requirements................................. 18

CONCLUSION...................................................................................................... 19

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                                              **Page(s)**

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ..................................................................................................18

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,*
    472 U.S. 585 (1985) ..................................................................................................15

*Bell Atlantic Corp. v. Twombly,*
    550 U.S. 544 (2007) ..................................................................................................18

*Broadcom v. Qualcomm, Inc.,*
    501 F.3d 297 (3rd Cir. 2007) ......................................................................4, 13, 18

In *re China Agritech, Inc. S'holder Deriv. Litig.,*
    No. 7163-VCL, 2013 WL 2181514 (Del. Ch. May 21, 2013) ................................18

*Eastman Kodak Co. v. Image Technical Services, Inc.*
    504 U.S. 451 (1992) ..................................................................................................12

*Ericsson, Inc. v. D-Link Sys., Inc.,*
    773 F.3d 1201 (Fed. Cir. 2014) ..................................................................................6

*Huawei Techs. Co. v. ZTE Corp.,*
    Case No. C-170/13 (C.J.E.U. July 16, 2015) ..........................................................13

*In re Innovatio IP Ventures, LLC Patent Litig.,*
    11 C 9308, 2013 WL 5593609 (N.D. Ill. Oct. 3, 2013) ......................................6, 17

*InterDigital Tech. Corp. v. Lenovo Group Ltd.*
    [2023] ..................................................................................................................11, 15

*Koninklijke KPN N.V. v. Bullitt Group Ltd.,*
    955 F.2d at 1368 ..................................................................................................11, 13

*Microsoft Corp. v. Motorola Inc.,*
    C10–1823JLR, 2013 WL 2111217 (W.D. Wash. Apr. 25, 2013) ........................6, 16

*Microsoft Corporation v. Motorola, Inc.,*
    795 F.3d 1024 (9th Cir. 2015) ........................................................................13, 15, 16

*NCAA v. Board of Regents,*
    468 US (1984) ..........................................................................................................13

*Optis Cellular Tech. LLC v. Apple Inc.*
    [2023] ............................................................................................................6, 11, 12

*Qualcomm Inc. v. Broadcom Corp.*,
    No. 05-CV-1958-B, 2007 WL 2296441 (S.D.Cal. Aug. 7, 2007) ...........................................14

*re Robert Bosch GmbH*,
    ' File No. 121-0081, Dkt. No. C-4377 (Apr. 23, 2013) ...........................................................7

*TCL Communication Technology Holdings, Ltd. v. Telefonaktiebolaget LM
    Ericsson*,
    2017 WL 6611635 (C.D. Cal. Dec. 21, 2017) .........................................................................16

*Verizon Comm'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004)..................................................................................................14, 15

**Statues**

Fed. R. Civ. P. 42 ..............................................................................................................12

Fed. R. Civ. P. 12 ..............................................................................................................18

**Other Authorities**

Joachim Henkel, *Licensing Standard-Essential Patents in the IoT* ................................................11

John Hayes & Assaf Zimring*, Injunctions in Litigation Involving SEPs* .......................................7

John Hayes et al., *A Critical Review of 5G SEP Studies* .................................................9

Knutt Blind, *Standards and Innovation: What Does the Research Say?* ......................................3

Mark A. Lemley & Timothy S. Simcoe, *How Essential are Standard-Essential
    Patents?*, 104 Cornell L. Rev. 607, 625 (2019) available at
    https://tinyurl.com/y2xs33e5 .................................................................................17

Raphael De Coninck, Christoph von Muellern, et al, *SEP Royalties, Investment
    Incentives and Total Welfare* .................................................................................3

Robert Pocknell, *Buying and Selling Smart Devices: SEP Licenses and
    Competition Law* (Mar. 25, 2024),
    https://www.keystonelaw.com/keynotes/buying-and-selling-smart-devices-
    sep-licences-and-competition-law ...................................................................9, 10

Rudi Bekkers *et al*, *Disclosure Rules and Declared Essential Patents* ...........................................8

Thomas Cotter, Erik Hovenkamp, & Norman Siebrasse, *Demystifying Patent
    Holdup*, 76 WASH & LEE L. REV. 1501, 1527–29 (2019) ..........................................4

## INTEREST OF AMICI CURIAE[1]

ACT | The App Association ("ACT") is a not-for-profit policy trade association for the small business technology developer community. ACT members are entrepreneurs, innovators, and independent developers within the app ecosystem that engage with verticals across every industry. The value of the ecosystem ACT represents—which it calls the app economy—is approximately $1.8 trillion and is responsible for 6.1 million American jobs, while serving as a key driver of the $8 trillion internet of things (IoT) revolution. ACT members lead in developing innovative applications and products across consumer and enterprise use cases, driving the adoption of IoT.

ACT files this brief in support of Plaintiff Disney Enterprises, Inc.'s ("Disney") opposition to Defendants' Motion to Dismiss or Stay this litigation. D.1.23. Disney has alleged that Defendants InterDigital, Inc. and its related entities (collectively, "Defendants") have used their standard-essential patents to violate the antitrust laws. The small innovators ACT represents have a strong interest in ensuring that the standard-essential patent (SEP) ecosystem functions fairly. As amici, ACT urges the Court to apply established antitrust principles to deny the motion and recognize that standard-essential patents grant market power to the patentee. Specifically, ACT respectfully submits that the complaint properly alleges InterDigital unlawfully obtained market power through its standards-development activity and that the alleged harm extends beyond merely seeking higher prices to the subversion of the competitive process itself.

---

[1] No counsel for any party wrote any part of this brief. No party other than amicus curiae's members contributed money that was intended to fund the preparation or submission of this brief. This brief is accompanied by a motion seeking leave to file. Plaintiff has consented to this filing, while Defendants have indicated they do not oppose this motion.

# BACKGROUND

## A.    Small Businesses Depend on Fair and Predictable SEP Ecosystems

Technical standards allow manufacturers to produce interoperable equipment by defining common protocols and specifications. Standards are ubiquitous in the modern world. Codecs, as at issue in this case, allow a sender to transmit audio and video data and ensure it can be accessed by the ultimate recipient. Codec standards explicitly encompass both encoding and decoding processes because a codec—short for coder-decoder—is designed as a complete system for compressing and reconstructing digital media. The encoding side defines how raw data, such as audio or video, is transformed into a compressed format, specifying algorithms, bitrates, and data structures to ensure efficiency and interoperability. The decoding side, equally critical, dictates how this compressed data is interpreted and reconstructed into a playable or viewable form, ensuring fidelity to the original content. By standardizing both directions, codec specifications guarantee that any compliant encoder can produce streams that any compliant decoder can accurately decode, preserving consistency, compatibility, and quality across devices and platforms.

Other than codecs, standards are frequently used to establish connectivity technology like 5G, Wi-Fi, and Bluetooth. Standards reduce the need for direct coordination during the product development process because each participant can design products around the agreed-upon specifications. Standards are developed by standard setting organizations (SSOs) which involve broad collaboration from industry stakeholders who work to identify and solve technical challenges necessary to establish uniform interoperability and product compatibility.

Standardization is particularly effective when an industry-wide uniform solution offers greater benefits than rapidly evolving, non-compatible technologies, especially where the cost of

frequent upgrades is high, and the advantages of such upgrades are limited. *See* Knutt Blind, *Standards and Innovation: What Does the Research Say?*, ISO Rsch. & Innovation Papers at 8 (Jan. 2022), https://www.iso.org/files/live/sites/isoorg/files/store/en/PUB100466.pdf. In such cases, the value of the technology is significantly enhanced by the positive network externalities created through standardization—on its own, a given technology may have little standalone utility. *See id.* at 9. By agreeing on shared specifications, companies can spread the cost of establishing the standard across an industry while mitigating the risk of it not being adopted and reducing redundant development efforts that would arise from parallel development of competing proprietary solutions. *See id.*

Although the adoption of a standard can slow certain aspects of "upstream" innovation—since radical or non-backward-compatible changes become more cumbersome—it frequently triggers significant "downstream" innovation among manufacturers who compete to utilize that standard. *See id.* at 8. Lower switching costs for consumers mean that they can more easily compare and migrate to products offering the best mix of quality, features, and price. As a result, manufacturers must continuously innovate in non-standardized features to differentiate themselves from rivals. This competitive dynamic drives substantial innovation in areas such as product design, user experience, and cost efficiency—outweighing the potential (and acceptable) impact on innovation of the technology underlying the standard. Raphael De Coninck, Christoph von Muellern, et al, *SEP Royalties, Investment Incentives and Total Welfare* at 3-4, Charles River Assocs. (*prepared for* Fair Standards All.) (Mar. 11, 2022). Over time, the result is a healthier market ecosystem where interoperability, consumer choice, and sustained innovation all thrive.

Small businesses, including those ACT represents, are particularly dependent on the

widespread availability of standards on reasonable terms for implementation. These entrepreneurs, innovators, and developers rely existing standardized codecs being compatible with consumer devices to ensure access to the broadest market. This allows them to dedicate their R&D resources on developing the unique features that set their products apart and bring them to market more swiftly. Eur. Comm'n., *Commission Staff Working Document: Impact Assessment Report* at 20 (Apr. 27, 2023), https://ec.europa.eu/info/law/better-regulation/have-your-say/initiatives/13109-Intellectual-property-new-framework-for-standard-essential-patents_en (hereinafter *Impact Assessment Report*).

### 1      The Importance of the FRAND Commitment in Standardization

Despite the benefits of standardization, adopting standardized technology creates risks. Once a company develops and begins to sell a product with a standardized feature, it typically becomes prohibitively costly to abandon the standard. *Broadcom v. Qualcomm, Inc.*, 501 F.3d 297 (3rd Cir. 2007). This is especially true if the standard has been widely adopted by an industry, leaving no alternative solutions, as is the case with communications standards such as cellular and Wi-Fi. *Id.*; Thomas Cotter, Erik Hovenkamp, & Norman Siebrasse, *Demystifying Patent Holdup*, 76 WASH & LEE L. REV. 1501, 1527–29 (2019). This phenomenon, known as "lock-in," can make companies that market standard compliant products susceptible to "hold-up." Hold-up occurs when owners of the patents essential to the standard—SEPs—use the threat of injunctive or exclusionary relief against locked-in manufacturers to extract unreasonable and excessive royalties. The risk of SEP hold-up can not only discourage companies from adopting standards but can also undermine many of the benefits standardization is intended to provide: it can increase costs for consumers, hinder innovation, and disadvantage small businesses. By

virtue of their inclusion in a standard and the resulting "lock-in" and elimination of alternatives, SEPs inherently confer market power upon the patentee.

To address this risk, many SSOs have developed intellectual property rights ("IPR") policies that require patent holders that voluntarily participate in the standard-setting process to make a binding commitment to license their SEPs on terms that are fair, reasonable, and non-discriminatory (FRAND).[2] Many standards, like USB and Bluetooth, operate under royalty-free frameworks, where manufacturers either pay nothing or a flat administrative fee to use the features of the standard in their devices. For other standards, SEP holders may charge royalties for use of their patented technology under the condition that their licenses comply with their FRAND commitments.

Ensuring the integrity of the FRAND commitment is paramount as industries implement connectivity technologies like 5G and Wi-Fi into their products. "According to recent … estimates, some 25–30 billion devices in the home and workplace will be equipped with sensors, processors and embedded software.…" *Core Principles and Approaches for Licensing of SEPs* at 19*,* CEN-CENELEC CWA 95000, https://tinyurl.com/2wepm8yh. "For proper market functioning as the connected economy develops, it will be critical to all market actors that FRAND licensing practices are followed and that abusive assertions are prevented." *Id.* at 20.

The FRAND commitment is particularly important for businesses developing new products. These companies must assess the costs and benefits of incorporating a particular standard early in the product development cycle, and it is critical that they have a sense of what

---

[2] Some standard setting development—like the International Telecommunications Union, which developed the standards at issue in this case—use reasonable and non-discriminatory, or RAND, as the basis of their intellectual property policy. Despite the difference in terminology, they are considered functionally equivalent.

their SEP licensing costs will be. The FRAND commitment is meant to give some foreseeability by providing a promise that the ultimate terms will be fair, reasonable, and non-discriminatory and not be extracted under the existential threat of market exclusion. However, in practice, that is not the case.

a.    **The Power Imbalances in SEP Licensing**

The FRAND commitment, as its name specifies, requires SEP holders to license their patents on terms that are **f**air, **r**easonable, **a**nd **n**on-**d**iscriminatory. A FRAND rate "should reflect the approximate value of [the SEP's] technological contribution, not the value of its widespread adoption due to standardization." *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1233 (Fed. Cir. 2014). The "royalty rate must reflect the value attributable to the infringing features of the product, and no more." *Id.*; *see also* Eur. Comm'n, Guidelines on the Applicability of Article 101 of the Treaty on the Functioning of the European Union to Horizontal Co-operation Agreements (Jul. 21, 2023), at ¶ 460 ("The economic value of the IPR could be based on the present value added of the covered IPR and should be irrespective of the market success of the products, which is unrelated to the patented technology.").

FRAND guarantees are undermined when an SEP holder leverages the market power conferred by the standard itself and demands royalties many times higher than the rates that courts ultimately adjudicate to be FRAND. *See, e.g.*, *In re Innovatio IP Ventures, LLC Patent Litig.*, 11 C 9308, 2013 WL 5593609, at *43 (N.D. Ill. Oct. 3, 2013) (finding a RAND royalty of $0.0956 per unit as compared to the demand of $16.17 per unit for tablet computers); *Microsoft Corp. v. Motorola Inc.*, C10–1823JLR, 2013 WL 2111217, at *99–100 (W.D. Wash. Apr. 25, 2013) (finding a FRAND rate of $0.03471 per unit compared to initial demands of $6–8 per unit); *Optis Cellular Tech. LLC v. Apple Inc.* [2023] EWHC 1095 (Ch) ¶¶ 342, 467(iv), 494

(May 10, 2023) (finding the FRAND rate was less than 2% of the rate demanded). Various mechanisms, including the power to threaten and obtain injunctions, give licensors a significant advantage in negotiations, allowing them to extract above-FRAND royalties. Moreover, the informational asymmetry between licensors and licensees amplifies this risk by making it exceedingly costly to negotiate with an aggressive SEP licensor.

> **b.    SEP Holders Systematically Evade FRAND Commitments Through Coercive Tactics and Information Asymmetry**

"[T]he concept of FRAND has been developed in an attempt to limit the ability of SEP holders to abuse their market power and to provide effective access to the standard for all interested third parties." Case COMP/M.6381 –*Google/Motorola Mobility,* Commission Decision at ¶ 107 (Feb. 13, 2012). However, it is not self-enforcing. *Id.* at ¶ 113. Companies bound by FRAND commitments still have the incentive to seek to evade their obligations to maximize their revenue. FRAND evasion "reinstate[s] the risk of patent hold-up that FRAND commitments are intended to ameliorate." Fed. Trade Comm'n., *Analysis of Agreement Containing Consent Orders to Aid Public Comment, 'In re Robert Bosch GmbH*,' File No. 121-0081, Dkt. No. C-4377, at 4 (Apr. 23, 2013).

Given that standards are frequently used in multi-functional devices and that standards frequently contain thousands or tens of thousands of patent families that have been declared essential, the cost of market exclusion can be orders of magnitude greater than the value attributable to the SEP. As a result, potential licensees faced with the prospect of an injunction are under substantial pressure to enter into licenses at above-FRAND royalties. John Hayes & Assaf Zimring*, Injunctions in Litigation Involving SEPs,* 6/2024 GRUR Patent 240, 242–43 (June 20, 2024), https://tinyurl.com/3dajevn4. This pressure is particularly acute for smaller companies who cannot afford to engage in costly litigation. Above FRAND royalties paid for

SEPs may ultimately be passed on to consumers through higher prices or reduced investment in R&D. *See, e.g.,* Fed. Trade Comm'n., *Analysis of Agreement Containing Consent Order to Aid Public Comment*, at 3 (June 10, 2005), https://tinyurl.com/y5b53m6e. ("According to Unocal's own expert, approximately 90 percent of this royalty charge is likely to be passed on to California consumers" in a case involving SEP ambush); A. Doug Melamed & Carl Shapiro, *How Antitrust Law Can Make FRAND Commitments More Effective,* 127 Yale L.J. 2110, 2114 (2018); Benno Bühler, Dominik Fischer & Bernhard Ganglmair, *Equilibrium Effects of the Availability of Injunctions in Standard-Essential Patent Licensing* (SSRN Working Paper, Jan. 26, 2025), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4390411.

2.     <u>**How Information Asymmetry in SEP Negotiations Advantages Licensors**</u>

In addition to the problem of injunctions, SEP licensing faces significant problems arising from an informational asymmetry. The asymmetry affords licensors a significant advantage that is ripe for and frequently abused. Licensors are well situated to assess the value of their portfolios, while licensees are not. Impact Assessment Report at 36. And this asymmetry is a global problem. As the European Commission has found, 100% of licensees reported insufficient information about FRAND royalties and 97% reported insufficient information about the SEP landscape, while only a small fraction of SEP licensors claimed the same. *Id.*

This asymmetry is amplified by several factors:

- The SSOs that develop many standards, including Wi-Fi, do not require SEP holders that commit to FRAND licensing to disclose which of their patents they believe are essential. Rudi Bekkers *et al*, *Disclosure Rules and Declared Essential Patents*, 52(1) Res. Pol'y 104618 at 3 (2023). This lack of disclosure makes it difficult for licensees

to estimate the share of the standard held in a licensor's portfolio or their potential total licensing liability for using the standard.

- For many standards, the vast majority of patents declared essential to the standard are not actually essential. Essentiality rates can vary significantly from portfolio to portfolio, and the cost of evaluating large portfolios can be prohibitively expensive. *See* John Hayes et al., *A Critical Review of 5G SEP Studies*, Charles River Assocs. 6 (Nov. 8, 2022), https://media.crai.com/wp-content/uploads/2022/11/09132755/Critical-Reviewof-5G-SEP-Studies_Nov-2022.pdf (noting studies have found SEP essentiality range from 8–33%).

- SEP portfolios often have significant rates of invalid patents when actually litigated. Matthew Rose, Jay Jurata, & Emily Luken, *"Between a Rock and a Hard Place": Unwired Planet v. Huawei and Dangerous Implications of Worldwide FRAND Licenses*, Concurrences No. 84684 at 6 (2017).

- Royalty demands by SEP licensors often exceed the actual market rate, and smaller companies typically lack both access to the licensor's other licenses agreements and adequate experience to make their own FRAND estimations. *See* Robert Pocknell, *Buying and Selling Smart Devices: SEP Licenses and Competition Law* (Mar. 25, 2024), https://www.keystonelaw.com/keynotes/buying-and-selling-smart-devices-sep-licences-and-competition-law.

As a result, estimating the aggregate royalty burden from using a standard and evaluating the value of an individual SEP portfolio can be incredibly expensive for licensees. And while SEP holders only need to make the upfront investment cost in evaluating the value (and weaknesses) of their portfolio once, potential licensees are required to make this expenditure for every license

negotiation. "[I]f a company (even a large one) is implementing the standard by using a component supplied by a third party, it will most likely have no knowledge of the relevant technology and must engage external experts to assist in the assessment of the royalty demand." Impact Assessment Report at 20. This ultimately affords SEP more leverage in negotiations by driving up the costs for licensees.

**3.    The Impact of Power Imbalances in SEP Licensing on Small Businesses and Emerging Industries**

These asymmetries pose a particularly significant problem for the SMEs (such as the App Association's members) who typically source their standard implementing components from third parties and lack both the resources and experience needed to negotiate or litigate for FRAND terms. Indeed, 38% of SEP users reported that the "costs involved in licensing SEPs (search, negotiation and litigation costs)" for SMEs was enough to make them "go out of business/change business." *Id.* at 15. In a recent study based on interviews with small and medium sized companies utilizing standards, participants reported how these transaction costs make SEP licensing negotiations unaffordable:

- "[I]t is for startups … impossible to find one's way in this jungle. Because for example I completely lack transparency as to which patents the technology of [the] modem in my device actually uses."

- "[A]s a startup, … as a small company, I have no way really of evaluating the legal validity of what [licensors] say or not. I have no way of knowing is this reasonable, or not reasonable when they actually say how much money they want, I have no idea whether it is the same as anybody else or it's specific to me, is that fair, there is no way of judging. So I have no way of actually evaluating their request on any kind of merit."

- "[By trying to evaluate a licensing offer] I would only delay my own innovation of the time to market and add a lot of cost I cannot afford to pay."

- "[F]or a startup, it's a substantial expense to get educated, because they'll have to reach out for expertise…. It's a cost that you didn't plan for. It's also a liability that your financier may not appreciate…."

- "[C]ourt arbitration and legal proceedings are not an option for small companies . . .

- "[T]here is no way for us to fight it, we are too small to take on a large organization…."

  Joachim Henkel, *Licensing Standard-Essential Patents in the IoT*, 51 Rsch Pol'y 1, 6–7 (2022).

Avoiding the cost of meaningful negotiations and litigation by acceding to SEP holders' demands can be detrimental to both the targeted small business and the market as a whole. Without the ability to meaningfully negotiate or litigate, small businesses often pay significantly more (on a per unit basis) than large licensees who have the resources and expertise to engage with SEP holders. In a recent case decided in the United Kingdom, the court observed that the only companies who paid the licensor's published "program rate" were "the smallest and least sophisticated licensees." *InterDigital Tech. Corp. v. Lenovo Group Ltd.* [2023] EWHC 539 (Pat) ¶ 516 (Mar. 16, 2023)*.* Another UK judge commented that *"*no implementer could stay in business paying [the licensor's] rates." *Optis Cellular Tech. LLC v. Apple Inc.* ¶ 467(iv) [2023] EWHC 1095 (Ch) (May 10, 2023).

In many cases, SEP holders target smaller companies for reasons other than generating revenue, given that the transaction costs "dwarf[]" the licensing revenue generated by the agreement. *Id.* at ¶ 398(iii)(b)(iv). For example, in *Koninklijke KPN N.V. v. Bullitt Group Ltd.*,

KPN engaged one of the most profitable law firms in the United States on a per-lawyer basis to

assert its SEPs in federal court, even though its demanded rate was no more than $1,080.

Defendant's Motion for Separate Trial Pursuant to Fed. R. Civ. P. 42, Exhibit 1 at 2, No. 21-44-

LPS, D.I. No. 22, Ex. 1 (D. Del. Aug. 26, 2021). Instead, the likely purpose of these endeavors is

to obtain agreements at above-FRAND rates to "produce comparable [license agreements] that

would assist" in licensing disputes with larger companies. *Optis*, [2023] EWHC 1095 at

¶ 398(iii)(b)(iv).

## ARGUMENT

### A.    SEP Holders That Obtain Supra-FRAND Royalties Are Exercising Market Power

During the standardization process, alternative technologies are almost always available,

Expert Report of Friedhelm Hillebrand on behalf of Nokia at ¶ 11, Nokia Corp. v. Qualcomm

Inc., 2330-VCS (Del. Ch. May 22, 2008), and the most difficult part of setting the standard is

forming a consensus on which of the competing solutions to adopt.  See, e.g., ETSI SMG

Meeting No. 24, Dec. 15-19, 1997, ETSI/SMG (97) 5 Part A.

However, once a particular patented technology is incorporated into a standard, those

alternative technologies are no longer available.  Moreover, once a company adopts the

standard—in reliance on the FRAND promises—the cost of switching to an alternative can

require significant investment.  The high switching costs can lock companies in to the standard,

meaning that a SEP holder "profitably could maintain supracompetitive prices." *Eastman Kodak

Co. v. Image Technical Services, Inc.* 504 U.S. 451, 476–77 (1992) (noting that the combination

of locked-in customers, high information costs, and the ability to engage in discriminatory

pricing made eliminated the risk of long term loss).

While standardization artificially removes competition for alternative technologies and creates lock in, the FRAND terms ensure that royalty rates remain at a rate that would be paid a hypothetical ex-ante market where competitive alternatives still exist. A SEP holder that can charge royalties in excess of the FRAND rate is thus able to extract royalties greater than those that would be paid in a competitive market.  This is the very definition of market power.  *NCAA v. Board of Regents*, 468 US, 85, 109 n.38 (1984) (defining market power as "the ability to raise prices above those that would be charged in a competitive market").

**B.    Breach of FRAND Constitutes Anticompetitive Conduct and Harms the Market**

Breaking a FRAND promise cannot be shielded from sanction under the competition laws by characterizing effective or explicit refusals to license as merely contractual breaches. *Vernon*, 955 F.2d at 1368 (rejecting argument "that antitrust liability may not be predicated on conduct which also happens to create a contract dispute").

Courts and competition authorities have repeatedly recognized that SEP holders can inflict significant competitive harm when they exploit the unavoidable nature of standard-essential patents to demand supra-FRAND royalties or to threaten injunctions as coercive leverage. In *Broadcom v. Qualcomm Inc.*, the court found that "the existence of monopoly power may be proven though direct evidence of supracompeitive prices" and that a SEP holder's breach of a FRAND promise "is actionable anticometitive conduct." 501 F.3d 297 (3rd Cir. 2007) Likewise, in *Microsoft Corporation v. Motorola, Inc.*, the court determined that aggressive royalty demands backed by injunction pressure reflected classic patent hold-up capable of inflating prices and impairing interoperability across the ecosystem. 795 F.3d 1024 (9th Cir. 2015) . The Court of Justice of the European Union in *Huawei Techs. Co. v. ZTE Corp.*, Case No. C-170/13 (C.J.E.U. July 16, 2015) held that SEP-based injunction threats without a genuine FRAND offer can constitute an abuse of dominance because they impede market access and

13

undermine the competitive functioning of standardized markets. The European Commission's decisions against Samsung and Motorola further concluded that deploying SEP injunctions to force licensing concessions produces exclusionary effects, distorts bargaining, and risks systemic harm to innovation and device-level competition.

While it is true that higher prices alone are not a sufficient antitrust injury, the harm from SEP licensing abuse is not merely supracompetitive pricing but a fundamental subversion of the competitive process itself. The anticompetitive conduct lies in the wrongful exploitation of market power. By making a FRAND commitment to induce an SSO to adopt its technology and then evading that commitment, an SEP holder weaponizes the standard to "hold up" implementers. The resulting supra-FRAND royalties are not the result of superior products or high demand, but are the direct and intended consequence of this coercive tactic, which raises rivals' costs, stifles downstream innovation, and ultimately reduces consumer choice. *Qualcomm Inc. v. Broadcom Corp.*, No. 05-CV-1958-B, 2007 WL 2296441, at *34 (S.D.Cal. Aug. 7, 2007) (describing such conduct as an attempt at "holding hostage the entire industry desiring to practice the…standard"). This is precisely the kind of harm to the "competitive process" that the antitrust laws are designed to prevent.

We urge this court to recognize that abusive SEP licensing practices can foreclose competitors, raise downstream costs, distort standard-setting incentives, and harm consumers, not merely individual licensees. We also urge this court to reject the suggestion that *Verizon Comm'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004) denies any duty to license competitors. Unlike in *Trinko*, the conduct at issue here includes a *promise* to provide FRAND licenses to all. Appellant made that promise in return for a significant benefit (*i.e.*, having its technology included in an industry standard and thereby obtaining the benefit of a

much broader licensing base). Indeed, the promise was required during the standard-setting process specifically to prevent the possibility that a refusal to license on FRAND terms might occur. *Microsoft,* 795 F. 3d at 103.  Because InterDigital voluntary promised to license to all on FRAND terms, this case is fundamentally different than *Trinko*, where the defendant would not ever have dealt with its rivals "absent statutory compulsion." *Trinko,* 540 U.S. at 409.  Likewise, here—and again precisely because of InterDigital's promise to license on FRAND terms—there is no issue of creating incentives to free-ride or of unfairly forcing InterDigital to share the rewards of its innovation. *Id*. at 407–408.  And there is no risk of collusion attendant to requiring InterDigital to license, as the licensing does not involve ongoing co-marketing, joint sale of consumer products, or anything else other than arms-length competition. *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 589–590 (1985).

## C.      Robust Judicial Review is Essential to Enforce the FRAND Bargain

The FRAND commitment exists to limit the anticompetitive wielding of the market power that SEPs inherently possess. However, as the evidence shows, this does not always happen in practice. Without robust judicial oversight, the FRAND commitment becomes an empty promise, resulting in much higher licensing rates being charged to small companies which lack the resources to challenge a patent owner's so-called "published rates."

The recent findings of the United Kingdom's High Court of Justice in *Interdigital v. Lenovo* are illustrative. The court examined the public "program" rates for SEP licenses that InterDigital, a major holder of 3GPP SEPs, published on its website. The court found that the seven largest manufactures of cellular handsets, which accounted for almost 98% of InterDigital's licensing, were offered steep discounts that were not made available to 15 small handset makers. *See id.* at ¶ 495, 579 ("I have reached the clear conclusion that the volume

discounts said to have been applied to the largest InterDigital licensees (i.e. in the range of 60%-80%) do not have any economic or other justification. Instead, their primary purpose is to attempt to shore up InterDigital's chosen 'program rates'. Their primary effect is discrimination against smaller licensees."). As the court noted, for these smaller businesses, their volume of licensing simply was not large enough to justify the expensive litigation that was required to discover the rates that were actually paid to InterDigital by larger companies. *See id.* at ¶ 609 ("[T]hese much smaller licensees were at much greater risk of their licence rates being driven by the fear of litigation costs, as opposed to a rigorous valuation of the portfolio in question. In some cases (Wistron and Fairphone), the evidence established that the licensees took the deal on offer with no negotiation at all."). The result was that while large entities paid a rate of just $0.175 per unit, small manufacturers were charged licensing fees of up to $1.31 per unit—a rate **7 times** higher than that paid by large companies. *See id.* at ¶ 583, 813. The U.K. court concluded that "the sizes of the volume discounts said to be used by InterDigital plainly discriminate against smaller licensees, which is exactly what FRAND is supposed to avoid." *Id.* at ¶ 499.

Similarly, in *TCL Communication Technology Holdings, Ltd. v. Telefonaktiebolaget LM Ericsson*, the patent owner demanded a 3% royalty rate. The court ultimately determined that the appropriate FRAND rate was 0.45%—less than one sixth of the patent owner's initial "FRAND" offer. No. SACV 14-341 JVS (DFMx), 2017 WL 6611635, at *3 (C.D. Cal. Dec. 21, 2017), *amended and superseded by* 2018 WL 4488286 (C.D. Cal. Sept. 14, 2018). Had the court granted the patent owner an injunction and thus compelled acceptance of the initial offer, the defendant—and ultimately consumers—would have paid **six times** the FRAND rate for the patents.

16

Other cases have uncovered even greater disparities. In the *Microsoft Corporation v. Motorola, Inc.*, litigation, the FRAND rate was found by the court to be $0.03972 per unit. No. C10–1823JLR, 2013 WL 2111217, at *4, *86, *100 (W.D. Wash. Apr. 25, 2013). The patent owner had initially demanded $8.50 per unit—a royalty rate that would have been ***214 times*** the FRAND rate. *See* David J. Teece & Edward F. Sherry, A Public Policy Evaluation of RAND Decisions in the U.S. Courts, 1 Criterion J. on Innovation 113, 119 n. 42 (2016), available at https://tinyurl.com/4mt4xpwn. And in *In re Innovatio*, the court determined that the asserted patents made only a minor contribution to the technical standard and awarded a rate of $0.0956 per unit. *In re Innovatio IP Ventures, LLC Patent Litig.*, 2013 WL 5593609, at *3, *12. The patent owner's initial demand had been $36.90 per unit—***386 times*** the FRAND rate. *Id.*

The problem of excessive initial rate demands is compounded by the growing number of entities that seek to extract patent royalties for a technical standard without making any meaningful contribution to the standard. Increasingly, these claimants patent every minor feature of a standard and demand royalties based on the sheer volume of their patents. But many of the SEPs asserted by patent assertion entities, in particular, are not actually essential to the standard. A 2019 study of patents that were declared essential to standard-setting organizations and asserted in court, for example, found that when these patents were litigated to a judgment by a patent-assertion entity, only ***6%*** of the patents were determined to be valid and essential. Mark A. Lemley & Timothy S. Simcoe, *How Essential are Standard-Essential Patents?*, 104 Cornell L. Rev. 607, 625 (2019) available at https://tinyurl.com/y2xs33e5.  The same study also found that PAEs accounted for about three-fourths of all SEPs litigation. *Id.* at 620.

In addition, even when patents are valid and essential to a technical standard, many standards have optional features that not every standard-compliant product will implement. In

17

the experience of amicus's members, when there is no adjudication of a FRAND rate, there is no

opportunity to adjust the rate to account for features and patents that some products or

applications do not invoke. The result is that manufacturers pay for expensive patented features

that they do not actually use.

### 1. Disney's Pleadings Satisfy Rule 12(b)(6) Requirements

To withstand a defendant's motion to dismiss under Federal Rule of Civil Procedure

12(b)(6), a plaintiff's pleading must state a facially plausible claim for which relief can be

granted. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). When considering the motion,

courts should accept the facts in the complaint as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678

(2009). These "pleading standards for purposes of a Rule 12(b)(6) motion 'are minimal'" and the

court only needs to consider "whether there is a 'possibility' of recovery." I*n re China Agritech,*

*Inc. S'holder Deriv. Litig.*, No. 7163-VCL, 2013 WL 2181514, at *23–24 (Del. Ch. May 21,

2013) (quoting *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 536–

37 (Del. 2011)).

Disney's complaint readily meets the Rule 12(b)(6) requirements. Disney alleges an

exclusionary scheme, including intentional deception of SDOs, suppression of competing

technologies, and intentional evasion of FRAND commitments. *See Broadcom v. Qualcomm,*

*Inc.*, 501 F.3d 297 (3rd Cir. 2007). Furthermore, Disney details cognizable harm to the

competitive process, including the foreclosure of alternative technologies, industry-wide

supracompetitive royalties, reduced adoption of standards, and chilled innovation, which are

precisely the type of market-wide injury antitrust laws targets. *Id.* We also note that Disney's

pleading does not challenge the right to petition the courts *per se*; rather, it details how the use of

serial foreign litigation functions as  part of an exclusionary scheme to coerce acceptance of non-

FRAND terms after manipulating the standards process. At minimum, these allegations plausibly state a claim, and dismissal would short-circuit the fact-intensive inquiries this case requires.

## CONCLUSION

For the reasons stated above, the Court should deny Defendant's Motion to Dismiss. ACT respectfully submits that this Court should consider the profound impact of its ruling on the ecosystem of small businesses and innovators who rely on predictable and balanced FRAND licensing principles. A clear and stable legal framework is essential to foster the downstream innovation, consumer choice, and healthy market competition that standardization is intended to promote.

Dated: November 21, 2025

| | |
|---|---|
| Of Counsel | YOUNG CONAWAY STARGATT & TAYLOR, LLP |
| Brian Scarpelli | |
| ACT | THE APP ASSOCIATION | /s/ *Adam W. Poff* |
| 1401 K St., NW | Anne Shea Gaza (No. 4093) |
| Suite 501 | Adam W. Poff (No. 3990) |
| Washington, DC 20005 | Rodney Square |
| (517) 507-1446 | 1000 North King Street |
| bscarpelli@actonline.org | Wilmington, Delaware 19801 |
| | (302) 571-6600 |
| | agaza@ycst.com |
| | apoff@ycst.com |

*Attorneys for The App Association*