**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| DISNEY ENTERPRISES, INC., | : |
| | : |
| *Plaintiff,* | : |
| | :    C.A. No. 25-996-MN |
| v. | : |
| | : |
| INTERDIGITAL, INC., et al., | : |
| | : |
| *Defendants.* | : |

**<u>AMICUS CURIAE BRIEF OF MOTION PICTURE ASSOCIATION, INC.</u>**

Dated: December 10, 2025

Anne Shea Gaza (No. 4093)
Adam W. Poff (No. 3990)
YOUNG CONAWAY STARGATT &
TAYLOR, LLP
Rodney Square, 1000 North King Street
920 North King Street
Wilmington, Delaware 19801
(302) 571-6600
agaza@ycst.com
apoff@ycst.com

Daniel E. Robbins (*pro hac vice pending*)
MOTION PICTURE ASSOCIATION, INC.
15301 Ventura Blvd., Bldg. E
Sherman Oaks, California 91403
(818) 995-6600
dan_robbins@motionpictures.org

Kelly M. Klaus (*pro hac vice pending*)
Carson J. Scott (*pro hac vice pending*)
MUNGER, TOLLES & OLSON LLP
560 Mission Street, 27th Floor
San Francisco, California 94105
(415) 512-4000
kelly.klaus@mto.com
carson.scott@mto.com

*Attorneys for Motion Picture Association, Inc.*

## <u>TABLE OF CONTENTS</u>

**Page**

I.    INTEREST OF THE AMICUS CURIAE ..................................................................1

II.   INTRODUCTION ...................................................................................................2

III.  ARGUMENT ..........................................................................................................4

    A.    Adherence to RAND Commitments Is Critical to the Ability of Streaming
          Providers to Offer High-Quality Content at Competitive Prices ...........................4

    B.    InterDigital's Deception of the ITU and Refusal to License SEPs on
          RAND Terms Harms Competition, Consumers, and Innovation ..........................7

    C.    *Broadcom* Squarely Holds that Antitrust Law Is an Important Backstop
          Against Anticompetitive Conduct by SEP Owners, and DOJ's Arguments
          for Disregarding or Distinguishing *Broadcom* Are Not Persuasive ......................9

    D.    Disney's Complaint More Than Adequately Pleads a Claim for Section 2
          Liability under *Broadcom* .....................................................................................15

    E.    DOJ's Analysis of *Noerr*'s Purported Relevance Is Incomplete ..........................17

IV.   CONCLUSION......................................................................................................19

# TABLE OF AUTHORITIES

**Page(s)**

FEDERAL CASES

*Actividentity Corp. v. Intercede Grp. PLC,*
  2009 WL 8674284 (N.D. Cal. Sept. 11, 2009) .......................................................................11

*AG v. InterDigital, Inc.,*
  2019 WL 1574322 (S.D. Cal. Apr. 11, 2019) .........................................................................11

*Amphastar Pharms., Inc. v. Momenta Pharms., Inc.,*
  297 F. Supp. 3d 222 (D. Mass. 2018) ....................................................................................11

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009).................................................................................................................17

*Broadcom Corp. v. Qualcomm Inc.,*
  501 F.3d 297 (3d Cir. 2007)............................................................................................ 4, passim

*In re Buspirone Patent Litig.,*
  185 F. Supp. 2d 363 (S.D.N.Y. 2002) ....................................................................................10

*Continental Auto. Sys. v. Avanci,*
  485 F. Supp. 3d 712 (N.D. Tex. 2020) ...................................................................................10

*Conwood Co. v. U.S. Tobacco Co.,*
  290 F.3d 768 (6th Cir. 2002) ..................................................................................................10

*Funai Elec. Co. v. LSI Corp.,*
  2017 WL 1133513 (N.D. Cal. Mar. 27, 2017)........................................................................11

*General Instrument Corp. v. Microsoft Deutschland GmbH,*
  2 O 240/11 (Landesgericht Mannheim May 2, 2012)..............................................................12

*Hynix Semiconductor Inc. v. Rambus Inc.,*
  527 F. Supp. 2d 1084 (N.D. Cal. 2007) ..................................................................................18

*Lenovo (United States) Inc. v. Interdigital Tech. Corp.,*
  2021 WL 1123101 (D. Del. Mar. 24, 2021) ...........................................................................11

*Microsoft Mobile Inc. v. Interdigital, Inc.,*
  2016 WL 1464545 (D. Del. Apr. 13, 2016)........................................................... 11, passim

*NYNEX Corp. v. Discon, Inc.,*
  525 U.S. 128 (1998).............................................................................................................13, 14

*Qualcomm Inc. v. Broadcom Corp.*,
    2007 WL 1031373 (S.D. Cal. Mar. 21, 2007) ........................................................13

*Rsch. In Motion Ltd. v. Motorola, Inc.*,
    644 F. Supp. 2d 788 (N.D. Tex. 2008) ............................................................9, 11

*United States v. Aluminum Co. of Am.*,
    148 F.2d 416 (2d Cir. 1945) ............................................................................10

*Wi-LAN Inc. v. LG Elecs., Inc.*,
    382 F. Supp. 3d 1012 (S.D. Cal. 2019)............................................................11

*Zenith Elecs., LLC v. Sceptre, Inc.*,
    2015 WL 12765633 (C.D. Cal. Feb. 5, 2015)............................................11, 18

**FEDERAL STATUTES**

35 U.S.C. § 284 ..................................................................................................14

15 U.S.C. § 2 ..............................................................................................10, 15

**OTHER AUTHORITIES**

A. Douglas Melamed & Carl Shapiro, *How Antitrust Law Can Make FRAND
Commitments More Effective*, 127 Yale L.J. 2110, 2120 (2018)...........................14

Carl Shapiro & Mark A. Lemley, *The Role of Antitrust in Preventing Patent
Holdup*, 168 U. Pa. L. Rev. 2019, 2028 (2020) ....................................................5, 6

Christopher R. Leslie, *The DOJ's Defense of Deception: Antitrust Law's Role in
Protecting the Standard-Setting Process*, 98 Or. L. Rev. 379, 397 (2020) .............................9

George S. Cary, Mark W. Nelson, Steven J. Kaiser, Alex R. Sistla, *The Case for
Antitrust Law to Police the Patent Holdup Problem in Standard Setting*, 77
Antitrust L.J. 913 (2011)..................................................................................12

Herbert Hovenkamp, Mark D. Janis, & Mark A. Lemley, *IP & Antitrust* .................................18

InterDigital, Portfolio Data, https://www.interdigital.com/portfolio-data (last
visited Nov. 18, 2025)........................................................................................15

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust
Principles and Their Application*..........................................................................11

## I.    <u>INTEREST OF THE AMICUS CURIAE</u>

The Motion Picture Association, Inc. ("MPA") is a not-for-profit trade association founded in 1922.  The MPA is a leading advocate for major producers and distributors of filmed entertainment and streaming services in the United States.[1]  The MPA and its members have a strong interest in ensuring that the antitrust laws continue to serve as a backstop when standard essential patent ("SEP") holders engage in deceptive conduct during standards development and in post-standardization holdup.  That type of conduct harms competition in markets that rely on standardized technologies.  The plaintiff in this case, Disney Enterprises, Inc. ("Disney"), alleges in exhaustive detail that the defendants (collectively, "InterDigital") are deliberately engaged in a wide-ranging scheme of just such anticompetitive conduct in the market for video streaming.

A number of MPA's members and/or their affiliates have first-hand experience with the same type of conduct of which Disney complains.  The MPA's members come to the issues involved in this case with a unique appreciation for the necessary balance between intellectual property rights and antitrust enforcement.  The MPA's members are committed to the protection of intellectual property rights.  Intellectual property is the lifeblood of the members' businesses.  At the same time, the members also recognize the vital role the antitrust laws play in protecting against anticompetitive conduct.  For these reasons, the MPA is well positioned to provide the Court with a balanced perspective on the antitrust and intellectual property issues that are raised in the briefing on the pending motion to dismiss.

---

[1] The MPA's member companies include Amazon MGM Studios LLC, Netflix Studios, LLC, Paramount Pictures Corporation, Sony Pictures Entertainment Inc., Universal City Studios LLC, and Warner Bros. Entertainment Inc.  Walt Disney Studios Motion Pictures, an MPA member and affiliate of Plaintiff Disney Enterprises, Inc., did not take part in the preparation or submission of this brief.

## II.    INTRODUCTION

Many standards development organizations ("SDOs") require, as a condition of participation in the standard-setting process, that owners of patented technologies essential to implementing adopted standards declare that they will license any such patents on reasonable and non-discriminatory ("RAND") terms.[2]  These declarations are contractual commitments intended to ensure that technology essential to implementing the resulting standards is available to everyone on fair terms.  SDOs rely on these commitments in selecting technologies to incorporate into standards, and in the absence of such commitments may steer (and have steered) standards away from technology not available on RAND terms.  Deception in the standards setting process and evasion of RAND commitments undermines this fundamental bargain.  Thus, safeguards against such deception and evasion are critical to preserving competition in markets that rely on standardized technologies.

The standards at issue in this case—video compression standards adopted by the International Telecommunication Union ("ITU")—are essential for interoperability between the services that provide motion picture content and the consumer devices on which that content is displayed.  The use of standardized video compression technology facilitates competition among content-delivery platforms, which are able to offer consumers access to their favorite shows and movies across a broad range of standards-compatible devices.  Market participants agree to use standards-based technologies knowing that licenses to intellectual property rights necessary to the operation of the standards are available on RAND terms.  RAND licensing thus facilitates

---

[2] RAND and FRAND (which stands for "fair, reasonable, and non-discriminatory") are often used interchangeably.

robust competition in terms of the overall quality of services offered by content-delivery platforms (how the standardized technology is *implemented*) and the prices that consumers pay.

The complaint's allegations vividly describe how that competition is undermined when an SEP owner engages in deceptive conduct during the standard-setting process and, post-standardization, renounces its RAND commitments and makes "holdup" demands to license the patented technologies that are necessary to the standards' implementation. Digital compression standards are an important component of the streaming ecosystem. To achieve reasonable costs in transmitting video data over the Internet, content must be compressed and decompressed through standards-compliant processes, irrespective of the content-delivery system or the device used to receive streamed content. This is because consumer hardware manufacturers (e.g., TV, phone, and computer makers) make devices that decode content according to these standards-compliant processes. Once an industry standard for compression technology is widely adopted, no participant can switch to a different technical feature outside the scope of the SEP holder's patent without abandoning the standardized technology altogether, thereby sacrificing interoperability, efficiency, and possibly quality. Although the SEP holder's technology faced competition from alternative technologies during the standard-setting process, these competitors are now effectively excluded from the market, leaving the SEP holder with monopoly power. This power only increases as participants further lock themselves into the standard via large investments in deploying standard-compliant products and services. Thus, SEP owners who use deceptive practices in the standard-setting process and thereafter ignore their RAND commitments achieve a monopoly without competing on the merits and are able to make exorbitant holdup licensing demands.

As the Third Circuit has long recognized, the antitrust laws are fully available as a remedy against such abuse. "Deception in a consensus-driven private standard-setting environment harms the competitive process by obscuring the costs of including proprietary technology in a standard and increasing the likelihood that patent rights will confer monopoly power on the patent holder." *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 314 (3d Cir. 2007). It is therefore "actionable anticompetitive conduct." *Id.*

Notwithstanding the clarity of this controlling law, the Antitrust Division of the United States Department of Justice ("DOJ") has filed a Statement of Interest. DOJ claims that it "takes no position on the resolution of" InterDigital's pending motion to dismiss. D.I. 28, DOJ Statement of Interest ("SOI") at 1. Nevertheless, DOJ argues at length that the antitrust laws have no role to play in deterring such anticompetitive conduct by the holders of standard essential patents.

Respectfully, the MPA submits that DOJ's legal and policy arguments are misguided, and that the Court should not rely on them in resolving the pending motion. Contrary to DOJ's arguments, the allegations of the complaint in this case fit squarely within *Broadcom* and other analogous precedent.

## III.    ARGUMENT

### A.    Adherence to RAND Commitments Is Critical to the Ability of Streaming Providers to Offer High-Quality Content at Competitive Prices

Modern digital streaming relies on technical interoperability in order to provide consumers a seamless viewing experience across different devices and content providers. Interoperability also enhances competition on price and quality. Consumers are able to access a range of streaming services on a single device, improving choice and spurring competition. And streaming services can rely on the same basic infrastructure to disseminate content to different

devices.  This obviates the need for services to invest in device-specific compression infrastructure—investments that would significantly increase the cost of streaming.

Interoperability in this area is possible because the industry follows consensus standards for video compression and decompression technologies.  These technologies are popularly referred to as "codecs."  The standards for codecs are developed and promulgated by the ITU, as noted above.  The standardized codecs incorporate a range of patented technologies, the practice of which is essential to implement the ITU standards.  Industry participants, including digital streaming companies and device manufacturers, invest heavily in standard-compliant technologies, including devices and processes that comply with the standardized codecs at issue here:  the H.264 or Advanced Video Coding ("AVC") standard and the H.265 or High Efficiency Video Coding ("HEVC") standard.  Those investments secure optimal interoperability, all to the benefit of the consumers who watch streamed content.

Reliance on standards provides valuable advantages and efficiencies, but it also leaves market participants vulnerable to the phenomenon of "post-standardization holdup."  Once a standard has been adopted, the SEP owner "is in a position to 'hold up' industry participants from implementing the standard" unless they agree to pay supra-RAND license fees.  *Broadcom*, 501 F.3d at 310.

The holdup problem has been widely documented and empirically validated.[3]  Leading commentators on antitrust and patent law have recognized that "[t]he danger of patent holdup is particularly high" where, as here, "SEPs that read on popular industry standards" are involved.

---

[3] The holdup problem has been validated by "[a]n impressive body of empirical work," including "[l]iterally hundreds of papers . . . published in peer-reviewed journals."  Carl Shapiro & Mark A. Lemley, *The Role of Antitrust in Preventing Patent Holdup*, 168 U. Pa. L. Rev. 2019, 2028 (2020).  The holdup problem is not unique to intellectual property licensing, but "[t]he conditions under which holdup is a danger apply with unusual force to patent holdup."  *Id.* at 2050.

Carl Shapiro & Mark A. Lemley, *The Role of Antitrust in Preventing Patent Holdup*, 168 U. Pa. L. Rev. 2019, 2043 (2020) ("Shapiro & Lemley"). That is because "[i]ndustry participants who have invested significant resources developing products and technologies that conform to the standard will find it prohibitively expensive to abandon their investment and switch to another standard." *Broadcom*, 501 F.3d at 310. When industry participants become "'locked in' to the standard," an SEP holder is in a "unique position of bargaining power" and "may be able to extract supracompetitive royalties." *Id.*

The ITU, like many other SDOs, addresses the holdup problem by requiring parties that have (or that have applied for) patents essential to standards under consideration to make RAND commitments as a condition of participating in the standards-development process. A RAND commitment requires a patent holder to grant licenses on reasonable and non-discriminatory terms if its patent is essential to a standard that the SDO ultimately adopts. As the complaint here alleges, InterDigital made RAND commitments to secure the inclusion of its patented technology in codec standards adopted by the ITU and associated SDOs. D.I. 1, Compl. ¶ 59.

The reliability and enforceability of RAND commitments are vital to the continued growth of streaming offerings and to preserving the incentives for content creation and follow-on technological innovation. If streaming service providers are able to rely on SEP holders complying with their RAND commitments, those providers can and will make significant investments in standard-compliant technologies to maximize the reach and price-adjusted quality of their product offerings. By contrast, the prospect of SEP holders *repudiating or evading* their RAND commitments disincentivizes such investments. As that investment incentive erodes, so too do the benefits to consumers.

**B.** **InterDigital's Deception of the ITU and Refusal to License SEPs on RAND Terms Harms Competition, Consumers, and Innovation**

The complaint describes in exhaustive detail how InterDigital's conduct has inflicted the exact harms long recognized to flow from deception in the standards-development process. InterDigital promised to grant licenses to its technology on RAND terms "as necessary for implementation of the resulting [standard]" in order to influence the ITU's standard selection process. D.I. 1, Compl. ¶ 59.[4] But InterDigital never had any intention of honoring its RAND commitments. *Id*. ¶ 61.

ITU's selection of InterDigital's patented technology for inclusion in the standard, and the corresponding "effective[] exclu[sion]" of other technologies, D.I. 1, Compl. ¶ 40, was based on that deception. InterDigital did not provide ITU or participants in the standard-setting process the opportunity to evaluate the true cost-adjusted value of InterDigital's technology and thus to design around that technology. The streaming services that Disney and others offer implement the H.264 and H.265 codec standards when compressing video content to provide compatibility with consumer devices that decompress that content and comply with the same standards (and that often are already licensed to InterDigital's patents). *Id*. ¶ 38. If a streaming service were to employ a different codec technology, the service's offerings would not work with most of the devices that consumers use to receive streaming content, thereby undoing the benefits of interoperability. *Id*. ¶ 39. This is because device makers (again most of whom are already licensed to InterDigital's patents) have widely adopted the H.264 and H.265 codecs. InterDigital engaged in deception not only to ensure that its patented technology would be necessary to

---

[4] InterDigital also was bound by RAND commitments made to the ITU by the Research & Innovation research and development organization of Technicolor—which InterDigital acquired in 2019—in connection with additional patents that supposedly covered technologies included in the H.264 and H.265 codec standards. D.I. 1, Compl. ¶¶ 51-58.

practice ITU's adopted standards, but also to induce other market participants, including content owners and streaming providers, to invest in products and related technologies that would comply with those standards and thereby put themselves at risk of patent holdup.  *Id.* ¶ 60.

With streaming providers locked into implementing the H.264 and H.265 codec standards (due to wide adoption by device makers), InterDigital turned to classic holdup tactics. InterDigital refused to grant licenses to streaming providers on RAND terms, instead demanding terms and conditions that "grossly exceed" those terms.  D.I. 1, Compl. ¶¶ 62-63.  Further, InterDigital has sought to "double-dip," demanding that streaming providers take royalty-bearing licenses even where those providers stream content to devices whose manufacturers *already are paying* InterDigital to license the same patents.  *Id*. ¶ 65.  And InterDigital is threatening to exclude streaming providers entirely from major global markets unless they capitulate to InterDigital's exorbitant demands.  InterDigital has filed patent infringement cases in foreign jurisdictions, seeking injunctive relief that would effectively prevent providers from offering their services in those markets.  *Id.* ¶ 71.

Disney is the plaintiff in this case, but it is hardly the only target of InterDigital's holdup campaign.  InterDigital is also in litigation with Amazon over patents associated with the same codecs at issue here.  *See* Ex. 1.  And there are many other market participants at risk of InterDigital's overreach.  InterDigital's public statements boast that there is "near ubiquity in consumer hardware support" for the HEVC/H.265 codec.  Ex. 2 at 12; *see id.* at 6 (explaining that "over 96% of consumer video products sold today have HEVC playback capability").  And InterDigital's analysis of 13 streaming service providers showed that *all* implement one or both of the H.264 or H.265 codecs.  These include Amazon Prime Video, Apple TV+, Netflix, and Hulu as well as the streaming services provided by NBC, Paramount, and Warner Bros.

Discovery. *Id.* at 14-15.  Absent legal intervention, InterDigital has every incentive to hold up any streaming service that is locked into the implementation of ITU's standardized codecs.

Faced with InterDigital's extortionary conduct, MPA's members are put in the bind of either meeting InterDigital's demands for supra-RAND royalties or fighting in court to hold InterDigital to its RAND commitments.  All of this involves substantial costs, which could lead to higher subscription fees or a reduction in the production and dissemination of content that is streamed.

> **C.** **_Broadcom_ Squarely Holds that Antitrust Law Is an Important Backstop Against Anticompetitive Conduct by SEP Owners, and DOJ's Arguments for Disregarding or Distinguishing _Broadcom_ Are Not Persuasive**

As the allegations in this case make clear, an unscrupulous SEP owner's improper conduct pre-and post-standardization can undermine the competition-enhancing safeguards that RAND commitments are meant to protect.  Where, as alleged here, the SEP holder makes a *false* RAND commitment and thereby "side-steps these safeguards in an effort to return the standard to its natural anti-competitive state, anti-competitive effects are inevitable."  *Rsch. In Motion Ltd. v. Motorola, Inc.*, 644 F. Supp. 2d 788, 796 (N.D. Tex. 2008).  "FRAND deceitfulness may lead to the improper exclusion of technologies that would have benefitted consumers in the long run." Christopher R. Leslie, *The DOJ's Defense of Deception: Antitrust Law's Role in Protecting the Standard-Setting Process*, 98 Or. L. Rev. 379, 397 (2020) ("Leslie").

In cases like this, the antitrust laws serve as a necessary "complement and [] backstop" to contractual RAND agreements.  Shapiro & Lemley at 2024.  The Third Circuit has expressly held that "[d]eception in a consensus-driven private standard-setting environment harms the competitive process," including by "increasing the likelihood that patent rights will confer monopoly power on the patent."  *Broadcom*, 501 F.3d at 314.  Accordingly, the Third Circuit has concluded that:

(1) in a consensus-oriented private standard-setting environment, (2) a patent holder's intentionally false promise to license essential proprietary technology on FRAND terms, (3) coupled with an SDO's reliance on that promise when including the technology in a standard, and (4) the patent holder's subsequent breach of that promise, is actionable anticompetitive conduct.

*Id.*

The Third Circuit's holding in *Broadcom* follows from the most fundamental principles of antitrust law. When an SEP holder enters into a RAND commitment that it does not intend to keep in order to secure its inclusion in an adopted standard, the SEP holder excludes competitors through means other than "skill, foresight and industry." *United States v. Aluminum Co. of Am.*, 148 F.2d 416, 430 (2d Cir. 1945) (Hand, J.). Such exclusionary conduct is quintessentially anticompetitive.[5]

In a footnote, DOJ claims to acknowledge that this Court is bound to follow *Broadcom*. D.I. 28, SOI at 13 n.13. But the thrust of DOJ's filing asks the Court either to effectively disregard *Broadcom* or to distinguish the case to the point of rendering it meaningless. None of DOJ's arguments withstand scrutiny.

First, DOJ claims that *Broadcom* has "been rejected elsewhere." *Id*. That observation is of little moment given that *Broadcom* is controlling in this Circuit. Nevertheless, DOJ's claim about *Broadcom*'s rejection is significantly overblown. DOJ identifies only a single district court decision from outside the Third Circuit that declined to follow *Broadcom*. *See id.* (citing *Continental Auto. Sys. v. Avanci*, 485 F. Supp. 3d 712 (N.D. Tex. 2020)). Yet numerous courts

---

[5] *Broadcom* fits comfortably within the broader antitrust jurisprudence establishing that deceptive conduct may qualify as anticompetitive conduct that triggers liability under Section 2 of the Sherman Act. *See, e.g.*, *Conwood Co. v. U.S. Tobacco Co.*, 290 F.3d 768, 783 (6th Cir. 2002) (antitrust liability for deceiving retailers into stocking product by furnishing false sales data); *In re Buspirone Patent Litig.*, 185 F. Supp. 2d 363, 376-77 (S.D.N.Y. 2002) (antitrust liability for attempting to exclude generic competitors by providing false information to the FDA).

have *followed Broadcom* in denying motions to dismiss where plaintiffs alleged exclusionary

deception during the standards-setting process; notably, several of these cases have involved

allegations of deceptive conduct in the standard-setting process by InterDigital, the defendant in

this case. *See, e.g.*, *Wi-LAN Inc. v. LG Elecs., Inc.*, 382 F. Supp. 3d 1012, 1022-1023 (S.D. Cal.

2019); *Amphastar Pharms., Inc. v. Momenta Pharms., Inc.*, 297 F. Supp. 3d 222, 230 (D. Mass.

2018); *Rsch. In Motion*, 644 F. Supp. 2d at 796; *Lenovo (United States) Inc. v. Interdigital Tech.

Corp.*, 2021 WL 1123101, at *8 (D. Del. Mar. 24, 2021); *u-blox AG v. InterDigital, Inc.*, 2019

WL 1574322, at *4 (S.D. Cal. Apr. 11, 2019); *Funai Elec. Co. v. LSI Corp.*, 2017 WL 1133513,

at *5 (N.D. Cal. Mar. 27, 2017); *Microsoft Mobile Inc. v. Interdigital, Inc.*, 2016 WL 1464545, at

*2 (D. Del. Apr. 13, 2016); *Zenith Elecs., LLC v. Sceptre, Inc.*, 2015 WL 12765633, at *5 n.1

(C.D. Cal. Feb. 5, 2015); *Actividentity Corp. v. Intercede Grp. PLC*, 2009 WL 8674284, at *3

(N.D. Cal. Sept. 11, 2009).

It is not only courts that have found *Broadcom* persuasive. A leading antitrust treatise

has endorsed that decision, concluding that "[a] sequence of (a) deception about one's current or

contemplated patent rights, plus (b) the alleged infringer's adoption of the covered technology in

reliance on this deception, and then (c) the patentee's announcement in contradiction to the

statements in (a), is clearly improper conduct." Phillip E. Areeda & Herbert Hovenkamp,

*Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 712d ("Areeda &

Hovenkamp").

Second, DOJ argues that antitrust remedies are unnecessary given the availability of

contract remedies where a party violates its RAND commitments. D.I. 28, SOI at 15-16. But the

potential existence of a breach-of-contract claim does not adequately address the full range of

anticompetitive consequences that flow from SEP deception and holdup. Many downstream

market participants and consumers may not be in privity with the entity making a RAND commitment and therefore may lack standing to enforce that commitment.  *See* George S. Cary, Mark W. Nelson, Steven J. Kaiser, Alex R. Sistla, *The Case for Antitrust Law to Police the Patent Holdup Problem in Standard Setting*, 77 Antitrust L.J. 913, 941 (2011).  Moreover, certain foreign courts, such as German courts, do not recognize RAND contractual commitments.  *See General Instrument Corp. v. Microsoft Deutschland GmbH*, 2 O 240/11 (Landesgericht Mannheim May 2, 2012), certified translation available at *Microsoft Corp. v. Motorola Inc.*, No. 2:10-cv-01823-JLR (W.D. Wash.), Dkt. 324-6 at p. 37.

The costs that flow from SEP holdup are not limited to just those cases where an SEP owner repudiates its RAND commitments and *actually* demands exorbitant license fees.  There are costs to competition from the *threat of SEP holdup*.  *See* Shapiro & Lemley at 2027.  The implementation of contractual mechanisms, including RAND commitments, to counter the threat of SEP holdup itself imposes costs.  And in some cases, the SEP holder may engage in gamesmanship or claim vagueness or ambiguity in the RAND commitment.  It costs significant resources, including expensive and time-consuming litigation, to rebut meritless contract arguments.  *Id.* at 2038.

With respect to the video compression codec standards at issue in this case, InterDigital has engaged in just such hair-splitting.  InterDigital tries to make much of the fact that the AVC and HEVC standards detail only the steps necessary for *decompressing* (or "decoding") content; InterDigital claims that this leaves it free to demand exorbitant license fees for the use of its patented technologies to *compress* (or "encode") the content.  *Compare* D.I. 24, InterDigital's Memorandum in Support of Its Motion to Dismiss at 2 (acknowledging that InterDigital "agreed to the SSO RAND terms" with respect to patents it contributed to "standard for decoding,

including H.264 ("AVC") and H.265 ("HEVC")"), *with id.* at 3 ("Disney *claims* that

InterDigital's *encoding-only* patent claims are RAND encumbered" (emphasis added)).  This

argument misreads the standard and is unjustified legally and economically.  It ignores, among

other things, that compression and decompression are two sides of the same coin: decompression

is worthless without compression.  That is, in order to deliver content that will be decompressed

using a standards-compliant device, the streaming service *must* compress the content according

to the same standard.  *See* Ex. 2 at 13 (explaining that "encoding decisions are influenced by the

population of consumer devices targeted for delivery, and their video decoding capabilities"); *see

also Qualcomm Inc. v. Broadcom Corp.*, 2007 WL 1031373, at *15-16 (S.D. Cal. Mar. 21, 2007)

(finding that encoding claims "reasonably may be essential to the practice of the H.264

standard").  InterDigital's argument is a contrived excuse for its blatant repudiation of RAND

commitments.

The bottom line is that where RAND commitments are perceived as providing weak

protection from SEP holdup, market participants' incentives to invest in standardized

technologies will be chilled.  That risks additional costs to consumers.  A meaningful antitrust

backstop that deters abuse of the standard-setting process and circumvention of RAND

commitments can reduce those costs and support the efficient functioning of the standardization

process.[6]

---

[6] DOJ cites *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128 (1998), in support of its argument that
contract remedies should be exclusive.  D.I. 28, SOI at 14.  But that case is inapposite; it deals
with deceptive conduct by a monopolist that had already *lawfully obtained* monopoly power.
*See id.* at 129 (noting that the "consumer injury naturally flowed not so much from a less
competitive market for removal services, as from the exercise of market power lawfully in the
hands of a monopolist . . . combined with a deception worked upon the regulatory agency that
prevented the agency from controlling the exercise of monopoly power").  Under *Broadcom* and
its progeny, deception in the SDO process may give rise to antitrust liability because, among
other reasons, the SEP holder may *unlawfully* obtain monopoly power *by virtue of* that deception.

Third, DOJ argues that the antitrust concern with hold*up* is overstated because (DOJ hypothesizes) there may exist a hold*out* problem.  In particular, DOJ argues that the existence of an antitrust remedy arising out of RAND violations could "incentivize bad faith bargaining on the part of a potential licensee who would have more to gain from failing to reach a deal."  D.I. 28, SOI at 16.  DOJ offers no empirical support for this claim, and commentators have labeled the holdout theory "deeply flawed."  Shapiro & Lemley at 2055; *see* A. Douglas Melamed & Carl Shapiro, *How Antitrust Law Can Make FRAND Commitments More Effective*, 127 Yale L.J. 2110, 2120 (2018) (finding "no factual support" for patent holdout argument).  Market participants who infringe valid patents have much to lose from failing to secure a license on RAND terms: infringers face the risk of patent remedies, including a reasonable royalty and in some cases treble damages, *see* 35 U.S.C. § 284, as well as injunctive relief in foreign courts, *see* D.I. 1, Compl. ¶ 71.  In any event, such concerns have little relevance where, as here, the SEP holder is alleged to have made false RAND commitments to ensure that their patents will cover standardized technologies.  An SEP holder that has achieved superior bargaining power through deceit should not be heard to complain of the speculative possibility of "bad faith bargaining" by his counterparty.  *See Broadcom*, 501 F.3d at 310-11.

Finally, DOJ argues that the straightforward application of *Broadcom* threatens to undermine incentives to innovate or to participate in "procompetitive" standards-development activity.  D.I. 28, SOI at 9.  That is both speculative and wrong.  DOJ has not shown, for example, that InterDigital or its predecessors were less incentivized to participate in standards

---

*See Microsoft Mobile*, 2016 WL 1464545, at *2 n.1 (rejecting argument that there is tension between *NYNEX* and *Broadcom*).

setting after *Broadcom*.[7]  SEP owners that make RAND commitments have agreed to receive

compensation on RAND terms in return for the inclusion of their patented technologies in the

adopted standard.  SEP owners are not entitled to a windfall, and certainly not a windfall secured

through deception and extortion.  Imposing liability on patentees that seek to manipulate that

bargained-for exchange does not deter innovation; rather, allowing meaningful remedies for

intentional, deceptive conduct *promotes* investment and innovation.  *Broadcom* thus incentivizes

a patentee to compete for inclusion of its standard based on the technology's scalability,

interoperability, or cost rather than through false promises or deceit.  *See* Leslie, 98 Or. L. Rev.

at 391-92.

      **D.**      **Disney's Complaint More Than Adequately Pleads a Claim for Section 2 Liability under *Broadcom***

Disney's complaint straightforwardly pleads a violation of Section 2 of the Sherman Act.

The complaint's allegations, discussed in relevant part in Section III.B, *supra*, are materially

indistinguishable from those held sufficient by the Third Circuit in *Broadcom* as well as by

courts in other cases in which InterDigital has sought to dismiss antitrust complaints against it

stemming from its holdup tactics.

As in *Broadcom*, Disney alleges that the defendant deceived an SDO by willfully making

false RAND Commitments.  D.I. 1, Compl. ¶ 61.  Like the plaintiff in that case, Disney alleges

that the SDO relied on those commitments in deciding to include the defendant's technology in

the standard.  *Id*. ¶¶ 54, 59.  And, just as in *Broadcom*, Disney alleges the defendant

subsequently breached its RAND commitments by refusing to offer a license on RAND terms

---

[7] Nor could it.  *Broadcom* preceded standardization of H.265 by several years, a standard on which InterDigital claims to have thousands of patents.  *See* InterDigital, Portfolio Data, https://www.interdigital.com/portfolio-data (last visited Nov. 18, 2025).

and engaging in a holdup campaign. *Id*. ¶¶ 62-74. Disney's complaint accordingly states a

claim. *See Microsoft Mobile*, 2016 WL 1464545, at *2 (denying motion to dismiss antitrust

claims against InterDigital where it was "difficult to discern any material differences between

[plaintiff's] complaint and the complaint which the Third Circuit found sufficient in

*Broadcom*").

DOJ seeks to avoid this conclusion in two ways, both erroneous. First, DOJ attempts to

superimpose on *Broadcom* a heightened pleading standard with respect to alternative

technologies, even though the Third Circuit expressly rejected that very requirement *in the*

Broadcom *opinion*. DOJ argues there can be "no presumption of market power . . . without an

assessment of the alternatives to the standard," D.I. 28, SOI at 10, and faults the complaint in this

case for not including an "identification of potential alternative technologies," *id*. at 12. Yet

*Broadcom* makes clear that a plaintiff does not have to identify potential alternative technologies

in order to state an antitrust claim. *Broadcom* notes that the defendant there "ma[de] much of the

Complaint's failure to allege that there were viable technologies competing . . . for inclusion in

the [relevant] standard." 501 F.3d at 316. But the Third Circuit declined to say that this was a

pleading defect. The court of appeals instead held that it was sufficient for the complaint to

allege "that an SDO's adoption of a standard *eliminates competing technologies*." *Id*. (emphasis

added). Disney has done just that. *See* D.I. 1, Compl. ¶¶ 10-12, 40.

Notably, InterDigital itself sought—and failed—to convince another court in this District

to impose the "potential alternative technologies" pleading requirement the DOJ seeks here. *See*

Opening Brief in Support of Motion to Dismiss, *Microsoft Mobile, Inc. v. Interdigital, Inc.*, 2015

WL 7069903 (D. Del. Nov. 4, 2015) (arguing plaintiff failed to allege, "as the law requires," the

specific "alternative technologies" the SDO did not adopt). The court did not accept

16

InterDigital's argument, and instead held the plaintiff sufficiently pleaded an antitrust violation

based on allegations that mirrored those in *Broadcom*. *Microsoft Mobile*, 2016 WL 1464545, at

*2.[8]

Second, DOJ impermissibly reads Disney's key allegations of deception out of the

complaint. DOJ claims to take no position on the resolution of InterDigital's motion to dismiss,

D.I. 28, SOI at 1, yet nonetheless offers an assessment of the sufficiency of the pleadings,

suggesting that "Disney's allegations of fraud during the competitive SDO standards-

development process . . . appear largely conclusory." *Id.* at 13 (citing *Ashcroft v. Iqbal*, 556 U.S.

662, 678 (2009)). DOJ does not explain what additional allegations would be required to

properly plead SDO deception. Instead, the balance of DOJ's discussion simply assumes away

any allegation of deception and critiques the strawman left behind. For example, DOJ argues

that Disney's attempt to "hing[e] antitrust liability on whether a patent holder violated its RAND

commitment . . . would create a 'sea of doubt' in standards development." *Id.* at 15. Of course,

Disney alleges far more than RAND commitment violation. *See, e.g.*, D.I. 1, Compl. ¶¶ 59-61

(alleging deception of ITU); *id.* ¶¶ 62-74 (alleging global holdup campaign). But, having waved

away Disney's core deception allegations, DOJ's argument proceeds as though those allegations

do not exist. DOJ's legal analysis is therefore unhelpful in assessing the sufficiency of Disney's

complaint for purposes of the pending motion to dismiss.

### E.    DOJ's Analysis of *Noerr*'s Purported Relevance Is Incomplete

The damages inflicted by InterDigital's abusive litigation campaign are properly

recoverable in an antitrust suit. DOJ asserts that "parties petitioning the government" are

---

[8] A leading antitrust treatise opines that, under a *Broadcom* theory of liability, the burden should
be "on the patentee to show that the other party would have adopted the technology even if the
misrepresentation had not been made." Areeda & Hovenkamp ¶ 712d.

generally "exempt[]" from antitrust liability under the *Noerr-Pennington* doctrine. D.I. 28, SOI at 17. That is true so far as it goes.[9] But where petitioning activity is part and parcel of a broader anticompetitive scheme that includes independently actionable conduct to which the petitioning activity is "causally connected," a court in this District has held it can be considered as part of the anticompetitive harm for purposes of assessing damages. *Microsoft Mobile*, 2016 WL 1464545, at *3. Other courts have followed the same approach, and leading antitrust and intellectual property commentators have endorsed that approach as "mak[ing]" particular "sense" in the SEP holdup context. Herbert Hovenkamp, Mark D. Janis, & Mark A. Lemley, *IP & Antitrust* § 11.04(f); *see, e.g.*, *Hynix Semiconductor Inc. v. Rambus Inc.*, 527 F. Supp. 2d 1084, 1096-97 (N.D. Cal. 2007); *Zenith Elecs., LLC v. Sceptre, Inc.*, 2015 WL 12765633, at *6 n.2 (C.D. Cal. Feb. 5, 2015). DOJ does not address these cases.

Disney's allegations meet the "causal connection" test. The complaint alleges conduct that is independently actionable under the antitrust laws: InterDigital's scheme to deceive the ITU with a false RAND commitment in order to make supra-RAND royalty demands for licenses to its SEPs. *See supra* Section III.D. And the complaint further alleges a causal connection between InterDigital's litigation campaign and its broader anticompetitive scheme, explaining that InterDigital's efforts to seek injunctive relief that would exclude Disney from key global markets "support[] its hold-up and discrimination" scheme by providing leverage to force Disney to "capitulate" to its extortionary demands. D.I. 1, Compl. ¶¶ 71, 73. Accordingly, the costs imposed by InterDigital's abusive litigation campaign should properly be considered as

---

[9] As DOJ recognizes, there are exceptions to *Noerr-Pennington* immunity, including where a defendant engages in "sham" petitioning conduct designed to use legal process to inflict competitive harm or where a plaintiff seeks to enforce a patent obtained by fraud. D.I. 28, SOI at 17.

part of Disney's harms for purposes of calculating damages caused by InterDigital's broader anticompetitive scheme.

## IV.    CONCLUSION

For the foregoing reasons, the MPA respectfully submits that the Court should decline DOJ's invitation to rewrite controlling antitrust law and should deny InterDigital's motion to dismiss the antitrust claims.

Dated: December 10, 2025

Of Counsel:

Daniel Robbins
MOTION PICTURE ASSOCIATION, INC.
15301 Ventura Blvd, Bldg E
Sherman Oaks, CA 91403
818.935.5815
dan_robbins@motionpictures.org

Kelly M. Klaus
Carson J. Scott
MUNGER TOLLES & OLSON LLP
560 Mission Street
San Francisco, CA 94105
415.512.4000
kelly.klaus@mto.com
carson.scott@mto.com

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/Adam W. Poff*
Adam W. Poff (No. 3990)
Anne Shea Gaza (No. 4093)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
apoff@ycst.com
agaza@ycst.com

*Attorneys for Amicus Curiae Motion Picture Association, Inc.*